IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RUTH SCOTT, individually, and as personal representative of the ESTATE OF MIKAEL SCOTT, a deceased individual; JEFF MUHLEMAN, individually, and as personal representative of the ESTATE OF TYLER MUHLEMAN, a deceased individual; and CINDY CRUZ, individually, | No. 84933-6-I DIVISION ONE PUBLISHED OPINION |
| Respondents, | |
| v. | |
| AMAZON.COM, INC., a Delaware corporation, | |
| Petitioner. | |
| MARY-ELLEN VIGLIS, individually, and as personal representative of the ESTATE OF DEMETRIOS VIGLIS, a deceased individual; JAMES PASSANNANTI, individually, and as personal representative of the ESTATE OF AVA PASSANNANTI, a deceased individual; and ANNETTE GALLEGO, individually, | No. 85558-1-I DIVISION ONE PUBLISHED OPINION |
| Respondents, | |
| v. | |
| AMAZON.COM, INC., a Delaware corporation, | |
| Petitioner. | |

HAZELRIGG, A.C.J. — The families of four individuals who purchased sodium nitrite on Amazon.com and ingested the substance in order to cause their own death by suicide brought suit against the online retailer. The complaints collectively present causes of action against Amazon for (1) products liability and negligence under the Washington product liability act[1] (WPLA), (2) common law negligence, (3) negligent infliction of emotional distress (NIED), and (4) violations of the Washington Consumer Protection Act[2] (CPA). The trial courts denied Amazon's CR 12(b)(6) motions to dismiss and this court granted discretionary review of those orders. As Washington law does not impose a duty on sellers to protect against intentional misuse of a product and binding case law directs that suicide under these circumstances breaks the chain of causation, the claims under the WPLA, for common law negligence, and for NIED all fail as a matter of law. Separately, the two plaintiffs with a cause of action under the CPA are unable to establish a prima facie claim. Accordingly, we reverse and remand for the trial court to enter orders dismissing both complaints.

FACTS[3]

These consolidated cases arose from the deaths of four individuals, Mikael Scott, Tyler Muhleman, Demetrios (DJ) Viglis, and Ava Passannanti (collectively,

---

[1] Ch. 7.72 RCW.
[2] Ch. 19.86 RCW.
[3] Because this case comes to us after denial of a CR 12(b)(6) motion to dismiss, the facts as set out herein are derived from the allegations in the complaints. Further, they are presumed to be true for purposes of our analysis under this procedural posture. *See Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007).

the purchasers[4]), who each died by suicide after intentionally ingesting sodium nitrite that they had ordered from Amazon.com. Sodium nitrite is a white and yellowish crystalline powder that is the most prevalent drug used to treat cyanide poisoning. Apart from sodium nitrite's legitimate usage in laboratory research and medical treatments, it is also used as a meat preservative and an ingredient in curing salts at a diluted level of approximately 6 percent purity. The brands of sodium nitrite that were purchased in these cases, HiMedia Sodium Nitrite and Loudwolf Sodium Nitrite, are 98 percent and 99.6 percent pure, respectively, and both brands had explicit warnings on their labels that the products were dangerous and toxic.[5] The chemical compound is highly soluble and "most people who use [s]odium [n]itrite for suicide," as occurred here, "consume it orally after mixing it with water."

On December 21, 2020, Mikael Scott purchased HiMedia Sodium Nitrite and a small scale on Amazon.com; both arrived two days later at the house that he lived in with his mother, Ruth, in Guadalupe County, Texas. Mikael, who was 27 years old at the time, had been diagnosed with severe anxiety disorder, schizoaffective disorder, bipolar I disorder, and agoraphobia approximately 10

---

[4] While we use "the purchasers" to refer to the plaintiff decedents, their estates, and their parents collectively, we will use last names when addressing causes of action specific to particular complaints.

Similarly, as many of the parties share a last name, we may occasionally refer to individuals by their first names for clarity. No disrespect is intended.

[5] The HiMedia brand included warnings about the danger of ingesting the sodium nitrite. The label had a symbol of skull and crossbones along with the words "Danger," "Toxic if swallowed," and "IF SWALLOWED: Immediately call a POISON CENTER or doctor/physician." This brand of sodium nitrite was manufactured by HiMedia Laboratories and sold online by Amazon.

Similarly, the Loudwolf label identifies that product as "a high-purity, reagent grade chemical" and warns that it is "INDUSTRIAL & SCIENTIFIC," "TOX," "HAZARD Oxidizer. Irritant." Loudwolf Sodium Nitrite was supplied by Duda Diesel and sold on Amazon.com starting in June 2017.

years earlier. On the night of December 26, Ruth worked a night shift, and at around midnight, Mikael texted her saying that he was ill and vomiting. When Ruth offered to come home Mikael told her that he was feeling better, so she stayed at work. Ruth returned the following morning and found vomit all over her bedroom. Mikael was laying on his bed in the fetal position and had passed away. Later that night, Ruth looked at Mikael's phone and saw that the internet browser was open to a website titled "Sanctioned Suicide." The complaint Ruth filed specifically asserts that "[t]he thread on Mikael's phone provided instructions from user '@Marktheghost' on how to die from [s]odium [n]itrite."

On May 22, 2021, when Tyler Muhleman was 17 years old, he purchased HiMedia Sodium Nitrite and Tagamet brand acid reducer on Amazon.com. The sodium nitrite arrived at Tyler's parent's house in San Jose, California on May 24. Tyler's parents, Jeff Muhleman and Cindy Cruz, invited him to go out to dinner with them the following night, but he declined and stayed home. When his parents returned home about two hours later, they found Tyler lying unconscious in his bedroom, his body blocking the door. His parents attempted to resuscitate him with cardiopulmonary resuscitation and called 911, but Tyler ultimately died. There was a bottle of HiMedia Sodium Nitrite in Tyler's room next to a glass with a spoon in it that was nearly full of a clear liquid. His death was ruled a suicide by sodium nitrite.

In late March 2020, DJ Viglis[6] ordered Loudwolf Sodium Nitrite from Amazon.com to be delivered to his mom's house in Henrico County, Virginia.

---

[6] The complaint establishes that DJ's first name is Demetrios, but uses DJ to refer to him throughout. Accordingly, we also use his preferred name.

When the global COVID-19[7] pandemic started that March, 19-year-old DJ "became isolated at home and depressed." After ordering the sodium nitrite, "DJ made up a story to tell his mom[, Mary-Ellen,] so that she wouldn't become suspicious if she happened upon the delivery." DJ told his mom the he had ordered the sodium nitrite and was "planning to learn how to cure meat with it since they were stuck at home." The product arrived at the Viglis' home on or around March 30, 2020. On April 3, DJ, Mary-Ellen, and her partner cooked and ate dinner together. That night, Mary-Ellen "asked DJ if she could sleep in his room so that she'd be there for him if he needed to talk." He declined her offer, but told his mom that he loved her and thanked her for loving him. In the middle of the night, DJ ingested sodium nitrite and Mary-Ellen's partner found him in the bathroom the following morning. DJ was pronounced dead shortly after responding law enforcement officers arrived at the home.

On December 8, 2020, Ava Passannanti, who was 18 years old, logged onto Amazon.com and purchased Loudwolf Sodium Nitrite under the name "Holly." The package from Amazon arrived at Ava's family home in Tucson, Arizona a week later. Ava had deferred enrollment at a university due to the COVID-19 pandemic and she resided with her parents, James Passannanti and Annette Gallego, and younger sister while starting an online college program. In the weeks leading up to her death, Ava "seemed to be doing well and demonstrated a positive outlook on life," and was participating in a therapy program for her mild depression. On February 23, 2021, Ava and her mom spent the day together at home. The

---

[7] 2019 novel coronavirus infectious disease.

following morning, Annette woke Ava up and made sure she took her medicine[8] and ate before leaving the house. When Ava drove away, instead of going to therapy, she stopped at a grocery store and purchased cups, spoons, water, mouthwash, toothpaste, a glass measuring cup, and Skittles candy. She then drove about fifteen minutes away and parked her car. Ava ingested sodium nitrite, and after doing so, called a 911 dispatcher, explained what she had done, and provided her location. Ava was crying while asking for help, and about five minutes into the call, she became unresponsive. While law enforcement arrived on the scene shortly thereafter to transport her to the hospital, Ava did not survive. Her cause of death was listed as sodium nitrite toxicity.

Scott & Muhleman Complaint

On February 3, 2022, Ruth Scott, individually, and as personal representative of the estate of Mikael Scott, filed a complaint against Amazon based on the death of her son who took his own life by ingesting HiMedia Sodium Nitrite that he purchased from Amazon.com. There were two causes of action in the complaint, "Count I: Products Liability," which included claims under the Washington Products Liability Act[9] (WPLA), and "Count II: Negligent Infliction of Emotional Distress." On March 22, Amazon moved to dismiss the complaint under CR 12(b)(6), primarily arguing that the claims were barred by Washington law as "there is no liability for another's decision to commit suicide unless the defendant

---

[8] The complaint does not describe the medication, so it is unclear if it was part of her treatment plan for depression or prescribed for some other unrelated medical condition.

[9] Ch. 7.72 RCW.

caused a mental state that rendered the suicide involuntary" or "had a special relationship giving rise to the duty to prevent the decedent's suicide."

On May 3, Scott sought leave from the court to amend the complaint to add (1) one claim of negligence against Amazon, (2) other plaintiffs and (3) further factual allegations in support of the new plaintiffs and claim. Amazon opposed the motion to amend the complaint, but following a hearing on May 20, the trial court granted leave to amend and continued the hearing on Amazon's motion to dismiss to June 17.

On May 20, Scott filed the first amended complaint, which added plaintiffs Jeff Muhleman, individually and as personal representative of the estate of Tyler Muhleman, and Cindy Cruz, individually. The amended complaint provided causes of action numbered as, "Count I: Products Liability," "Count II: Negligence," "Count III: Negligent Infliction of Emotional Distress." On June 3, Amazon moved to dismiss the Scott and Muhleman amended complaint. It again contended that "Washington law precludes any cause of action against Amazon based on [the purchasers'] unilateral decisions to take their own lives." Additionally, Amazon asserted the WPLA "statutorily bars [p]laintiffs from applying their novel theories of liability to a product seller like Amazon."

The court heard argument from the parties on June 17 and reserved ruling on the motion to dismiss. Over six months later, on December 30, 2022, the trial court entered an order that denied Amazon's CR 12(b)(6) motion to dismiss.

Shortly thereafter, Amazon filed a motion for RAP 2.3(b)(4) certification on two controlling questions: whether Washington state recognizes a duty for

manufacturers and sellers to refrain from lawfully selling a non-defective product to an individual who intentionally misuses the product to commit suicide, and whether the WPLA supports claims for failure to warn or consumer expectation tests when the user disregards the warning. Following a hearing on the motion, the court denied Amazon's motion for certification of the questions.

#### Viglis & Passannanti Complaint

On March 30, 2023, Mary-Ellen Viglis, individually, and as personal representative of the estate of Demetrios Viglis, James Passannanti, individually, and as personal representative of the estate of Ava Passannanti, and Annette Gallego, individually, filed a complaint against Amazon. Both DJ and Ava had purchased Loudwolf Sodium Nitrite on Amazon.com for use in suicide and ingested it for that purpose. Viglis and Passannanti alleged that Amazon was "liable for promoting and aiding in DJ's and Ava's suicides." The causes of action in their complaint are, "Count I: Products Liability," which includes claims of negligence under the WPLA directed at Amazon as a product seller, "Count II: Negligence," under common law theories, and "Count III: Violation of the Consumer Protection Act."[10]

On May 3, Amazon filed a CR 12(b)(6) motion to dismiss the complaint. According to Amazon, the Viglis and Passannanti complaint "fails to state a claim for relief under Washington law because of [the] well-established rules against imposing civil liability on third parties for another's suicide." Amazon argued that "binding precedent precludes the [c]omplaint from establishing the essential duty

---

[10] Ch. 19.86 RCW.

and proximate cause elements of [p]laintiffs' tort claims."  It also contended both the WPLA and CPA claims failed as a matter of law.  On June 16, following a hearing on the motion to dismiss, the trial court denied Amazon's motion and explained that "summary judgment will be an appropriate place to deal with the case as discovery's proceeded."

In both cases, Amazon filed notices in this court seeking discretionary review of the orders denying its CR 12(b)(6) motions to dismiss the complaints.  A commissioner of this court granted discretionary review and consolidated the cases under No. 84933-6-I.[11]

ANALYSIS

"A trial court's ruling on a motion to dismiss for failure to state a claim upon which relief can be granted under CR 12(b)(6) is a question of law and is reviewed de novo."  *Cutler v. Phillips Petrol. Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994).  "Dismissal is proper only when we can determine, beyond a reasonable doubt, that there are no facts that would justify recovery."  *Birnbaum v. Pierce County*, 167 Wn. App. 728, 732, 274 P.3d 1070 (2012).  "The court presumes all facts alleged in the plaintiff's complaint are true and may consider hypothetical facts supporting the plaintiff's claims."  *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007).  Courts should grant CR 12(b)(6) motions "'sparingly and with care' and 'only in the

[11] Scott and Muhleman filed a petition to modify the commissioner's ruling, but a panel of judges denied the motion under RAP 17.7.

Scott and Muhleman then sought discretionary review by our state Supreme Court under RAP 13.3(a) and 13.5 and argued that this court committed "obvious error."  Despite several assertions in the order of the Supreme Court commissioner that the Court of Appeals likely committed obvious error, one of the express bases for granting direct review under RAP 13.5(b)(1), he denied their motion for discretionary review.

unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" *Paradise, Inc. v. Pierce County,* 124 Wn. App. 759, 767, 102 P.3d 173 (2004) (quoting *Cutler,* 124 Wn.2d at 755).

I.      Washington Product Liability Act

Enacted in 1981, the WPLA was "designed to address a liability insurance crisis which could threaten the availability of socially beneficial products and services." *Wash. Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 850, 774 P.2d 1199, 779 P.2d 697 (1989).  The statute "preempts any claim or action that previously would have been based on any 'substantive legal theory except fraud, intentionally caused harm or a claim or action brought under the [CPA]." *Bylsma v. Burger King Corp.*, 176 Wn.2d 555, 559, 293 P.3d 1168 (2013) (quoting RCW 7.72.010(4)).  The "WPLA creates a single cause of action for product-related harms that supplants previously existing common law remedies." *Graybar Elec.*, 112 Wn.2d at 860.  A product liability claim is broadly defined to encapsulate the following:

> [A]ny claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously based on: Strict liability in tort; *negligence*; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter 19.86 RCW.

RCW 7.72.010(4) (emphasis added).

As our Supreme Court has explained, the "WPLA is the exclusive remedy for product liability claims." *Macias v. Saberhagen Holdings, Inc.,* 175 Wn.2d 402, 409, 282 P.3d 1069 (2012). Because common law remedies for product-related harms are preempted by the WPLA, a product liability claim "cannot be maintained on a common law negligence theory." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 323, 858 P.2d 1054 (1993). "Insofar as a negligence claim is product-based, the negligence theory is subsumed under the WPLA product liability claim." *Macias,* 175 Wn.2d at 409. Consequently, the purchasers' causes of action based on common law negligence theories are expressly preempted by the WPLA.

"The substantive liabilities of product manufacturers and sellers towards individuals or entities asserting product liability claims are specifically delineated in the statute." *Graybar Elec.*, 112 Wn.2d at 850. Manufacturers are subject to liability if the plaintiff can show their harm was proximately caused by negligence "in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1). Manufacturers may be strictly liable if the plaintiffs can show their harm was proximately caused by a product that is "not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW." RCW 7.72.030(2). Here, none of the purchasers allege that Amazon was the manufacturer of the sodium nitrite.

Rather, each suit asserts Amazon as a "product seller," and liable as such, under RCW 7.72.010(1).[12]

Under the WPLA, a product seller is subject to liability only if the plaintiff's harm was *proximately caused* by one of the following:

> (a) The negligence of such product seller; or (b) Breach of an express warranty made by such product seller; or (c) The intentional misrepresentation of facts about the product by such product seller or the intentional concealment of information about the product by such product seller.

RCW 7.72.040(1). Relying on RCW 7.72.040(1)(a) and (c), the purchasers allege that Amazon was negligent as a product seller and that it intentionally concealed information about the sodium nitrite on its website.

A.     Intentional Concealment and Misrepresentation Claim

Scott and Muhleman contend that Amazon "intentionally concealed warnings and other information on the bottle on its website" and "intentionally removed and concealed negative product reviews that warned consumers of the products use for death by suicide." Similar claims are made in the Viglis and Passannanti complaint. Amazon points to the plain language of the statute and asserts that the purchasers fail to state a claim upon which relief can be granted because they do not allege any "intentional misrepresentation *of facts about the*

_____

[12] However, Scott and Muhleman also allege that Amazon is liable as a manufacturer pursuant to RCW 7.72.030(1)(b) and (c). While RCW 7.72.040(2) provides five specific circumstances in which a product seller may be held liable as a manufacturer, the purchasers do not identify or argue any of them in either their complaint or briefing before this court. As noted, the plaintiffs identify the manufacturers of the sodium nitrite in their complaints and only allege the fact that Amazon is the product seller. Thus, we treat Amazon as a product seller subject to liability under the WPLA on the bases provided in RCW 7.72.040(1).

*product*" or "the intentional concealment *of information about the product*." RCW 7.72.040(1)(c) (emphasis added). Amazon is correct.

In response, the purchasers reference allegations in the complaint such as, "Amazon's concealment that it does in fact provide independent accounts to minors," "Amazon concealing from vendors that the product was being purchased by children and vulnerable adults," and "Amazon misrepresenting that it is advisable and recommended that people who purchase sodium nitrite should also purchase anti-vomit medication, a suicide manual[13] with instructions on death via sodium nitrite, and a personal scale." These allegations, while jarring, simply do not fall within the scope of RCW 7.72.040(1)(c).

Again, for a seller to be liable under this provision of the WPLA, the statute requires an intentional misrepresentation or concealment "of facts about *the product*" or "information about *the product*." *Id.* (emphasis added). Assuming the truth of these allegations as we must within the framework of CR 12(b)(6), the facts of Amazon providing accounts to minors, recommending other purchases along with sodium nitrite, or failing to disclose that vulnerable adults and children had purchased sodium nitrite, are not sufficient to state a claim under the plain language of RCW 7.72.040(1)(c). More critically, even if the purchasers could show intentional misrepresentation or concealment by Amazon about sodium nitrite, such a claim would still fail because proximate cause does not exist as a matter of law under these circumstances.

---

[13] There is no allegation in either suit that any of the purchasers in these cases also bought a "suicide manual" on Amazon.com.

B.      Seller Negligence Claim

Amazon contends that liability is precluded on the basis of seller negligence because the WPLA requires a defective product in order for liability for negligence to attach to a seller under RCW 7.72.040(1)(a). As the "sodium nitrite was obviously not defective," Amazon avers the purchasers cannot state a viable claim under this theory.

"We review questions of statutory interpretation de novo." *Money Mailer, LLC v. Brewer*, 194 Wn.2d 111, 116, 449 P.3d 258 (2019). Our "fundamental objective is to ascertain and carry out the [l]egislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "We look first to the text of a statute to determine its meaning." *Dep't of Transp. v. City of Seattle*, 192 Wn. App. 824, 837, 368 P.3d 251 (2016). "If the plain language is subject to only one interpretation, our inquiry is at an end." *Id*.

There is no defective product predicate anywhere in the text of the WPLA that restricts liability for the negligence of a product seller. RCW 7.72.040(1)(a) simply provides that a seller other than a manufacturer is liable to the claimant based on the "negligence of such product seller." When interpreting a statute, we "must not add words where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.,* 150 Wn.2d 674, 682, 80 P.3d 598 (2003). While Amazon looks beyond the plain language of the statute into pre-WPLA case law and legislative history for support of this unwritten rule, we need not continue the inquiry as the plain language of the WPLA is only subject to one interpretation

here. *See Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Because the WPLA expressly provides that product sellers may be liable for negligence and the legislature did not include any defective product requirement in the text of the statute, Amazon's contention here is unavailing.

Amazon primarily relies on *McCarthy v. Amazon.com, Inc.*, where a federal district court addressed nearly identical claims as those raised here and held that a seller cannot be liable for negligence under the WPLA "unless the product at issue was defective." 679 F. Supp. 3d 1058, 1069 (W.D. Wash. 2023). Not only is the district court's decision not binding on this court, it is also unpersuasive on this specific issue as the holding was based in part on McCarthy's "failure to dispute the issue" that WPLA negligence claims are limited to those involving defective products. *Id*. Here, the purchasers do contest Amazon's proposed rule and their opposition is sound.[14]

Though we disagree with the *McCarthy* court's interpretation of the WPLA on that point, the district court rejected the WPLA negligence claim against Amazon on multiple grounds and others are applicable here. Regarding McCarthy's negligence claim against Amazon for failure to warn, the district court

---

[14] Amazon also relies on *Knott v. Liberty Jewelry & Loan, Inc.* in support of its assertion that a product seller cannot be liable for negligence under the WPLA unless the product is defective. 50 Wn. App. 267, 748 P.2d 661 (1988). Knott brought various claims under the WPLA and common law theories seeking to hold the "manufacturers, assemblers, distributors and sellers of Saturday Night Specials" liable because the decedent was intentionally shot by someone who had purchased that make of firearm. *Id*. at 271-72.

Knott alleged that the handguns were defective by nature of their "unreasonably unsafe design" and were distributed and sold negligently, but this court rejected all of Knott's proffered bases of liability and affirmed the dismissal of his claims. *Id*. at 272. The court explained that "'[g]uns may kill; knives may maim; liquor may cause alcoholism; but the mere fact of injury does not entitle the [person injured] to recover . . . there must be something wrong with the product.'" *Id*. at 276 (some alterations in original) (quoting *Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 147, 727 P.2d 655 (1986)). This court held that there must be "a showing that the injury-causing product was defective before liability can be imposed." *Id*.

- 15 -

cited numerous Washington cases supporting the conclusion that there is no duty to warn if the danger is obvious or known. *Id.* at 1070; *see also Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn. App. 432, 438, 739 P.2d 1177 (1987) (noting no duty to warn of obvious danger under both negligence and strict liability theories); *Anderson v. Weslo, Inc.*, 79 Wn. App. 829, 835, 906 P.2d 336 (1995) (observing danger of injury from trampoline use obvious and manufacturer or seller need not warn of obvious danger); *Mele v. Turner*, 106 Wn.2d 73, 78, 720 P.2d 787 (1986) (holding owner not required to warn user of danger of putting hands under running lawnmower when danger was obvious and known). The federal district court then provided multiple examples of Washington courts "consistently hold[ing] that a warning label need not warn of 'every possible injury.'" *McCarthy*, 679 F. Supp. 3d at 1070 (quoting *Weslo,* 79 Wn. App. at 840); *see also Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 141-42, 727 P.2d 655 (1986).

The *McCarthy* court concluded that the warnings on the sodium nitrite were sufficient as the "label identified the product's general dangers and uses, and the dangers of ingesting [s]odium [n]itrite were both known and obvious." 679 F. Supp. 3d at 1070. As the decedents in that case had "deliberately sought out [s]odium [n]itrite for its fatal properties, intentionally mixed large doses of it with water, and swallowed it to commit suicide," the court stated that they "necessarily knew the dangers of bodily injury and death associated with ingesting [s]odium [n]itrite." *Id*. at 1070-71 ("[U]nder Washington law, suicide is 'a voluntary willful choice' by a person who 'knows the purpose and the physical effect of the suicidal act.'" (quoting *Webstad v. Stortini*, 83 Wn. App. 857, 866, 924 P.2d 940 (1996))).

Additionally, the *McCarthy* court held the plaintiffs' negligent seller claim failed under the WPLA because, "even if Amazon owed a duty to provide additional warnings as to the dangers of ingesting sodium nitrite, its failure to do so was not the proximate cause" of the deaths at issue. *Id*. at 1071-72.

Although the WPLA does not bar claims against Amazon for negligence on the basis that the sodium nitrite it sold was not defective, the purchasers' claims premised upon seller negligence theories fail as a matter of law nonetheless. To establish a cause of action for negligence they must show, "(1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Hansen v. Wash. Nat. Gas Co.,* 95 Wn.2d 773, 776, 632 P.2d 504 (1981). Here, the purchasers can neither show that Amazon owed them the specific duty they allege nor establish that Amazon proximately caused their deaths by suicide. Even assuming the truth of the allegations in their complaints or considering hypothetical facts, because these elements cannot be satisfied as a matter of law, the trial court erred when it denied Amazon's CR 12(b)(6) motions to dismiss.

1.      Duty as Seller

"The most common vehicle for circumscribing the boundaries of liability has been the court's definition of duty." *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976). The "determination of whether an actionable duty was owed to the plaintiff represents a question of law to be decided by the court." *Cummins v. Lewis County*, 156 Wn.2d 844, 852, 133 P.3d 458 (2006). Whether a duty exists "'depends on mixed considerations of logic, common sense, justice, policy, and

- 17 -

precedent.'" *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d 752, 763, 344 P.3d 661 (2015) (internal quotation marks omitted) (quoting *Christensen v. Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 67, 124 P.3d 283 (2005)). "In general, courts will find a duty where reasonable persons would recognize it and agree that it exists." *Tallariti v. Kildare*, 63 Wn. App. 453, 456, 820 P.2d 952 (1991).

In the negligence claims in each of the complaints, the purchasers allege that Amazon owed duties to (1) "exercise reasonable care," (2) "not assist or aid in a suicide attempt," and (3) "not supply a substance for the use of another whom it knew or had reason to know to be likely to use it in a manner involving unreasonable risk of physical harm to [themselves]."

In *Webstad*, Division Two of this court plainly held that "the law provides no general duty to protect others from self-inflicted harm, i.e*.,* suicide." 83 Wn. App. at 866. "Suicide is 'a voluntary willful choice determined by a moderately intelligent mental power, which knows the purpose and the physical effect of the suicidal act.'" *Id*. (internal quotation marks omitted) (quoting *Hepner v. Dep't of Lab. & Indus.*, 141 Wash. 55, 59, 250 P. 461 (1926)). As such, "the person committing suicide is in effect both the victim and the actor." *Id*. "In fact," the court explained, "no duty exists to avoid acts or omissions that lead another person to commit suicide unless those acts or omissions directly or indirectly deprive that person of the command of [their] faculties or the control of [their] conduct." *Id*.

The purchasers attempt to distinguish *Webstad* on the basis that, there, the "negligence theories rested on very different grounds from the families' negligence claims here." Despite the clear language of *Webstad* that "no duty exists to avoid

acts or omissions that lead another person to commit suicide," *id*., absent circumstances not present here, the purchasers claim in briefing that "*Webstad* does not foreclose Amazon having a duty arising from affirmatively supplying a killer chemical to young and vulnerable people." They attempt to cultivate this duty through various sources.

The purchasers first aver that Amazon had a "duty as a supplier of chattel" under *Restatement (Second) of Torts* § 390 (Am. L. Inst. 1965), which provides:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of [their] youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to [themselves] and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Bernethy v. Walt Failor's, Inc*., 97 Wn.2d 929, 933, 653 P.2d 280 (1982). Relying on *Bernethy*, in which the Supreme Court adopted § 390, the purchasers contend that "Amazon owed these vulnerable people a duty not to supply them with sodium nitrite—a harmful chattel—that Amazon knew was being used for self-harm."

In *Bernethy*, the plaintiffs filed a wrongful death action against the owners of a gun shop and alleged that they negligently sold a firearm to a visibly intoxicated individual, Robert, who used the gun to kill his wife, Phoebe. *Id*. at 930-31. Robert had been drinking heavily for the previous 24 hours and was obviously intoxicated when he left Phoebe and friends at a bar and walked to the gun store to purchase a rifle. *Id*. at 931. Robert recalled "wetting his pants before entering the store, falling and staggering as he walked into the store and having to rest his arms on the counter to support himself." *Id*. The owner of the store, Walt Failor, was

working as the salesperson. *Id*. After Robert inspected a rifle and agreed to purchase it, Failor laid the weapon on the counter next to Robert, along with ammunition. *Id*. When Failor turned away to complete the required firearm transaction record, Robert picked up the rifle and ammunition and walked out of the store. *Id*. Robert walked one-half block back to the tavern and shot Phoebe. *Id*. at 931, 935. He was arrested immediately and his blood alcohol level was ultimately determined to have been .23 percent at the time of the incident. *Id*. at 932.

In its consideration of the existence of the seller's duty, the *Bernethy* court looked at the criminal statute prohibiting the sale of pistols to incompetent people, RCW 9.41.080, and noted that it "reflects a strong public policy in our state that certain people should not be provided with dangerous weapons." *Id*. at 932-33. Adopting the *Restatement (Second) of Torts* § 390, the court explained that the basis for "imposing this general duty is that one should not furnish a dangerous instrumentality such as a gun to an incompetent." *Id*. at 933. Further, the *Bernethy* court noted it had already recognized an analogous cause of action for negligent entrustment of a vehicle to an intoxicated individual and stated it is common sense that "'one cannot let or loan to another, knowing that other to be reckless and incompetent, and in such a condition that he would be reckless and incompetent, an instrumentality which may be a very dangerous one in charge of such a person.'" *Id*. at 934 (quoting *Mitchell v. Churches*, 119 Wash. 547, 552-53, 206 P. 6 (1922)). As the *Bernethy* court emphasized, the owner of the gun shop "placed a gun and ammunition in the hands of a visibly intoxicated person." *Id*. at 935.

Here, patently distinct from the circumstances in *Bernethy*, there was no face-to-face transaction between Amazon and the purchasers of sodium nitrite that might have alerted the online retailer to the fact that any one of them may be "an incompetent." And more critically, regarding *Restatement (Second) of Torts* § 390, our Supreme Court has explained that the kinds of "incompetency" that fall within this rule are provided in the illustrations and include the following:

> [G]iving a loaded gun to a feeble minded child of 10; permitting a 10-year-old child, who has never driven an automobile before, to drive one; permitting one's chauffeur, who is in the habit of driving at excessive speeds, to drive the car on an errand of his own; lending one's car to a friend to drive to a dance, knowing that the friend habitually becomes intoxicated at dances; and renting an automobile to a person who says that he plans to drive it from Boston to New York in 3 hours to win a bet.

*Mele*, 106 Wn.2d at 77. The circumstances in the cases now before this court are vastly distinct from any of those provided in § 390. Frankly, even if these sodium nitrite purchases had been in-person transactions, the reality of mental illness or an acute mental health crisis is that many who suffer are able to mask their suicidal intentions even from loved ones who know them intimately, so there can be no inference that an online seller would have been able to detect or understand any possible risk of the purchaser's misuse of the product for self-harm. The purchasers do not engage with this significant factual distinction between their cases and the illustrations of § 390 applicability set out in case law.[15]

---

[15] Though the purchasers did not allege this theory in their complaints, they now contend on appeal that they had a special relationship with Amazon that gave rise to a protective duty under the *Restatement (Second) of Torts* § 315, which provides the following:

> There is no duty so to control the conduct of a third person as to prevent [them] from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

The purchasers also contend Amazon had a duty to exercise reasonable care under *Restatement (Second) of Torts* § 281. This is true. As our Supreme Court has explained, "Actors have a duty to exercise reasonable care to avoid the foreseeable consequences of their acts." *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 757, 310 P.3d 1275 (2013) (citing RESTATEMENT (SECOND) OF TORTS § 281 cmts. c, d). However, the existence of Amazon's duty of reasonable care to the purchasers here does not render the company responsible for their self-harm. Once a legal duty is established, the "scope of that duty is determined by analyzing the foreseeability of the harm to the plaintiff" and it can be decided as a matter of law "where reasonable minds cannot differ." *Lee v. Willis Enters., Inc.,* 194 Wn. App. 394, 401-02, 377 P.3d 244 (2016). While Amazon had a duty to exercise reasonable care to avoid the foreseeable consequences of its acts, the scope of that duty plainly does not extend to "protect[ing] others from self-inflicted harm" or

---

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 200, 943 P.2d 286 (1997). The purchasers cite to *Nivens*, wherein the court held "a special relationship exists between a business and an invitee *because the invitee enters the business premises* for the economic benefit of the business." *Id.* at 202 (emphasis added). *Nivens* explained that "the business has a duty to take reasonable steps to prevent harm to its invitees *from the acts of third parties on the premises*, if such acts involve imminent criminal conduct or reasonably foreseeable criminal behavior." *Id.* at 207 (emphasis added). Here, again, none of the purchasers entered any physical premises owned by Amazon, and thus, there was no special relationship giving rise to a duty pursuant to § 315 that may have otherwise required Amazon to protect the decedents from the actions of others while they were on Amazon's property.

Amazon responds in briefing that application of the special relationship and duty from *Nivens* here would require this court to extend the duty of shop owners to protecting invitees from dangers that are not on the premises and from harms that may occur days after an invitee has left the property. We reject this exceedingly broad proffered extension of the law.

The purchasers also attempt to establish duty via special relationship by relying on *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 244 P.3d 924 (2010), which focuses on the relationship between a "jailer" and inmates based on the custodial role and control exercised. The purchasers cannot demonstrate that Amazon had any control over them while they visited its website, much less so much authority as to create an "affirmative duty to provide" for their "health, welfare, and safety," such that this body of case law would control here. *Id.* at 639.

to "avoid[ing] acts or omissions that lead another person to commit suicide unless those acts or omissions directly or indirectly deprive that person of the command of [their] faculties or the control of [their] conduct." *Webstad*, 83 Wn. App. at 866. Even if we were to disagree with *Webstad* and extend the duty of sellers so as to encompass the purchasers' causes of action here, on the basis that Amazon was obligated to protect them from self-harm and not "facilitate" their suicides, the purchasers' claims still fall short. Regardless of how the purchasers frame the proffered duty and attempt to broaden its scope in order to encapsulate the tragic harm here, there can be no proximate cause of the deaths of these individuals. This is true because our Supreme Court's binding precedent from long-established and controlling case law forecloses proximate cause by deeming the act of suicide a superseding cause.[16]

### 2. Proximate Cause

The purchasers cannot show that Amazon's actions or omissions proximately caused these devastating suicides under the circumstances presented.

"Proximate cause is an essential element of an actionable negligence claim." *Adgar v. Dinsmore*, 26 Wn. App. 2d 866, 880, 530 P.3d 236 (2023), *review denied,* 2 Wn.3d 1014 (2024). It has two components: "cause in fact and legal

---

[16] The purchasers also attempt to establish a "duty of care when a product seller directly supplies the means of death by suicide" and rely on RCW 9A.36.060(1), which provides that a person is "guilty of promoting a suicide attempt when [they] knowingly cause[] or aid[] another person to attempt suicide." Even if this criminal statute was strong enough to support a corresponding duty in tort law for liability against Amazon in this case, which it is not, the purchasers' claims independently fail because they cannot establish proximate cause.

causation." *Baughn*, 107 Wn.2d at 142. "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985). "Legal causation, on the other hand, rests on policy considerations as to how far the consequences of defendant's acts should extend." *Id*. at 779. Legal causation requires courts to determine "whether liability *should* attach as a matter of law given the existence of cause in fact." *Id*. Our Supreme Court determined nearly a century ago that liability does not attach to a death by suicide unless either there was a special relationship, which cannot be established here, or the decedent's decision to commit suicide was proximately caused by the defendant's negligence such that the suicide was not truly a voluntary act.

The latter scenario was addressed in *Arsnow v. Red Top Cab Co*., wherein the decedent was seriously injured by the defendant's taxicab, and shortly after the accident, committed suicide. 159 Wash. 137, 138-39, 292 P. 436 (1930). The surviving spouse brought a wrongful death action against the cab company based on the suicide but the *Arsnow* court held that, as a matter of law, the death "cannot be held to have been the proximate result of the injuries which he suffered at the time of the collision with defendant's taxicab." *Id*. at 162. *Arsnow* established the rule of proximate cause in such cases as follows:

> [L]iability *may* exist on the part of a person, situated as is defendant here, where the death of the person injured results from [their] own act committed in delirium or frenzy and without consciousness or appreciation on [their] part of the fact that such act will in all reasonable probability result in [their] death, or when the act causing the death is the result of an uncontrollable impulse resulting from a mental condition caused by the injuries.

*Id.* at 156 (emphasis added). The court went on to recognize that "[t]he rule that one who negligently injures another is not liable to one in plaintiff's situation, under the circumstances now before us, may seem harsh, but, if the law were otherwise, a logical extension of the rule would lead to many difficulties." *Id.* at 160.

After carefully considering out-of-state authority provided by both Arsnow and the taxi company, the court held that

> [t]he doctrine of proximate cause is well established in our system of jurisprudence, and is a salutary and, indeed, a necessary rule. It seems to us clear that the defendant herein can only be held liable to plaintiff by an extension of the rule applicable to such cases, and we do not feel that the law as it now stands should be so extended.

*Id.* at 161. Just over 30 years later, our Supreme Court plainly declared that "[t]he rule stated in the *Arsnow* case was and still is correct." *Orcutt v. Spokane County*, 58 Wn.2d 846, 850, 364 P.2d 1102 (1961). *Arsnow* remains undisturbed, and accordingly, this intermediate appellate court is bound to follow the controlling case law of our Supreme Court. *See 1000 Virginia Ltd. P'ship v. Vertecs Corp.,* 158 Wn.2d 566, 578, 146 P.3d 423 (2006); *State v. Gore,* 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

Expressly adopting the archaic language of the *Restatement of the Law of Torts*, § 455 (Am. L. Inst. 1934) in describing various mental health conditions, the court in *Orcutt* articulated the rule as follows:

> "If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to [themselves] while delirious or insane, if [their] delirium or insanity
> (a) prevents [them] from realizing the nature of [their] act and the certainty or risk of harm involved therein, or

>         (b) makes it impossible for [them] to resist an impulse caused
> by [their] insanity which deprives [them] of [their] capacity to govern
> [their] conduct in accordance with reason."

58 Wn.2d at 850-51. As our Supreme Court explained, "'[W]hen [a person's] insanity prevents [them] from realizing the nature of [their] act *or controlling* [*their*] *conduct*, [their] suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable.'" *Id. at* 851 (quoting WILLIAM L. PROSSER, TORTS § 49 (2d ed. 1955)). However, the *Orcutt* court also held that "if the suicide is during a lucid interval, when [they are] in full command of [their] faculties but [their] life has become unendurable to [them], it is agreed that [their] voluntary choice is an abnormal thing, which supersedes the defendant's liability.'" *Id.* at 852 (quoting PROSSER, TORTS § 49).

Here, there is no allegation that Amazon injured any of the purchasers in a manner that "caused a mental condition which resulted in an uncontrollable impulse to commit suicide." *Id*. at 852-53. For Amazon to be liable for these catastrophic deaths under the causes of action presented here, the purchasers must be able to show proximate cause. Even at the CR 12(b)(6) stage, the complaint presents no facts, nor are there hypothetical facts that we can identify, to satisfy the binding standard that "injuries inflicted by the defendant caused the decedent[s] to enter into a state of delirium or frenzy or to become subjected to an insane and uncontrollable impulse to commit suicide, resulting in death at [their] own hand[s]." *Id*. at 853. Because the allegations in the complaints, which we accept as true for purposes of CR 12(b)(6), establish only that the purchasers each

initiated contact with Amazon with the intent to seek out sodium nitrite in order to take their own lives and then knowingly ingested the chemical for that purpose, these facts can only show that they were in command of their faculties and made voluntary choices to commit suicide. Accordingly, their actions supersede any potential liability for Amazon under this legal theory. *Id*. at 852.[17]

While the parties offer competing case law in support of their respective positions on duty and superseding cause, neither identifies the source of the apparent disparity. The purchasers are correct that the duty of Amazon is rooted in the *Restatement*, but Amazon is also correct that the concept of suicide as a superseding cause set out in *Arsnow* controls. The dissonance comes from the fact that the rule articulated in *Arsnow* was adopted from the *Restatement (First) of Torts* § 455, which was published in 1934. *Orcutt*, 58 Wn.2d at 850-51. Amazon has a duty to purchasers under *Restatement (Second) of Torts* § 281, which has been adopted and relied on by our Supreme Court in multiple cases. *See Washburn*, 178 Wn.2d at 757; *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550, 442 P.3d 608 (2019). However, the authority of our Supreme Court controls over any secondary sources like the *Restatement*. *State v. Jussila*, 197 Wn. App.

---

[17] This determination also resolves Scott's and Muhleman's claim for negligent infliction of emotional distress (NIED), wherein they argue that "Amazon owed plaintiffs a duty to exercise reasonable care to avoid causing them severe emotional distress." "Bystander negligent infliction of emotional distress claims involve emotional trauma resulting from one person's observation or discovery of another's negligently inflicted physical injury." *Hegel v. McMahon*, 136 Wn.2d 122, 125-26, 960 P.2d 424 (1998). "The bystander theory of recovery is a collateral claim for damages suffered indirectly as the result of the defendant's breach of a duty *owed to the decedent*." *Est. of Lee v. City of Spokane*, 101 Wn. App. 158, 175, 2 P.3d 979 (2000).

Thus, to recover under the bystander theory, as the parents of Mikael and Tyler attempt to do here as plaintiffs in their individual capacities, they must establish that Amazon breached a duty owed to the decedents. *Id*. As discussed, Amazon did not breach any duty owed to the purchasers because the act of suicide was an independent superseding cause, and therefore, the NIED claims fail as a matter of law even under the forgiving standard of CR 12(b)(6).

908, 931, 392 P.3d 1108 (2017) ("We must follow Supreme Court precedence, regardless of any personal disagreement with its premise or correctness."). So, while Amazon has a general duty under the more recent *Restatement (Second)*, that does not control over other case law from our Supreme Court that expressly set aside an exception to liability for negligence where suicide is the superseding cause of the death. Again, as an intermediate appellate court, we may not disturb or disregard binding precedent from our State's high court and must follow its more specific case law directly controlling on the nature of the cause of action presented. Reconciliation of the case law regarding suicide as a superseding cause and the seller's duty under the *Restatement (Second)* is beyond the authority of this court.

II. Washington Consumer Protection Act

The Viglis and Passannanti complaint also pleads a cause of action under our state's CPA. Specifically, they allege that "Amazon's conduct is a violation of the legislation against promoting a suicide attempt, RCW 9A.36.060, and is an unfair or deceptive act in trade or commerce in violation of the [CPA]." According to the complaint, Amazon knew sodium nitrite was commonly purchased for suicide but withheld that information and continued to sell the product. Viglis and Passannanti further contend that Amazon's "marketing of [s]odium [n]itrite and other recommended products to complete suicide" and "delivery of [s]odium [n]itrite to individuals at residential addresses is unlawfully deceptive in violation of the [Consumer Protection] Act." Amazon avers these claims are barred by the CPA's "injury-to-business-or-property requirement."

The CPA made unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The statute created a right of action for "[a]ny person who is injured in [their] business or property." RCW 19.86.090. To present a prima facie claim under the CPA, plaintiffs must establish the following five elements: "(1) an unfair or deceptive act or practice; (2) in the conduct of trade or commerce; (3) which impacts the public interest; (4) injury to the plaintiffs in their business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered." *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 852, 792 P.2d 142 (1990).

Here, the fourth element is at issue; Amazon contends the claim fails as Viglis and Passannanti do not present any facts, actual or hypothetical, to establish that the purchasers were injured in their business or property. "To state a valid CPA claim, a plaintiff must prove that the injury, separate from any monetary loss, is to business or property." *Ambach v. French*, 167 Wn.2d 167, 174 n.3, 216 P.3d 405 (2009). "Compensable injuries under the CPA are limited to 'injury to [the] plaintiff in [their] business or property.'" *Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 430, 334 P.3d 529 (2014) (first alteration in original) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 780, 719 P.2d 531 (1986)). "Personal injuries, as opposed to injuries to 'business or property,' are not compensable and do not satisfy the injury requirement." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 57, 204 P.3d 885 (2009). "[D]amages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA." *Id*. "Had the [l]egislature intended to include actions

for personal injury within the coverage of the CPA, it would have used a less restrictive phrase than 'business or property.'" *Stevens v. Hyde Athletic Indus., Inc.*, 54 Wn. App. 366, 370, 773 P.2d 871 (1989). "This limitation clearly excludes stand alone personal injury claims like those for pain and suffering." *Ambach*, 167 Wn.2d at 174. It also "prevents a plaintiff from claiming expenses for personal injuries as a qualifying injury in and of itself." *Id*. at 176 (emphasis omitted).

Although Viglis and Passannanti frame the issue as a mere attempt to recover the purchase price of the sodium nitrite and insist they are not seeking redress for personal injuries, their CPA claim is premised on the same factual allegations against Amazon that form the basis of their causes of action brought under the WPLA. *See id.* at 178-79 (rejecting Ambach's CPA claim for payment of surgery during which she was injured because "what she really seeks is redress for her personal injuries, not injury to her business or property"). The *Ambach* court emphasized that "the CPA was not designed to give personal injury claimants such backdoor access to compensation they were denied in their personal injury suits." *Id*. at 179 n.6. Similarly, here, Viglis and Passannanti use this claim to seek redress for personal injuries and not injury to business or property, and thus, their CPA claim should be dismissed under CR 12(b)(6).

This case presents truly tragic facts about profound loss and illuminates some of the many impacts of the internet on suicidal ideation and mental health generally: the broad availability of instruction about, or support for, suicide, and the previously unfathomable accessibility to instrumentalities of death. It also poses compelling questions about the expansion of corporate liability in the context of

- 30 -

online retailers and algorithmic recommendations. Ultimately, it has highlighted a point in our cultural evolution where the controlling law has yet to adapt to our lived experiences and this intermediate appellate court is without the authority to harmonize them.

Reversed and remanded.

Hazelrigg, A.C.J.

WE CONCUR:

Bowman, J.    Smith, C.J.