**FILE**

IN CLERK'S OFFICE

SUPREME COURT, STATE OF WASHINGTON

FEBRUARY 19, 2026

*Stephe, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 19, 2026

*Sarah Pendleton*

SARAH R. PENDLETON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| RUTH SCOTT, individually, and as personal representative of the ESTATE OF MIKAEL SCOTT, a deceased individual; JEFF MUHLEMAN, individually, and as personal representative of the ESTATE OF TYLER MUHLEMAN, a deceased individual; and CINDY CRUZ, individually, <br><br> Petitioners, <br><br> v. <br><br> AMAZON.COM, INC., a Delaware corporation, <br><br> Respondent. | No. 103730-9 <br><br> En Banc <br><br> Filed: <u>February 19, 2026</u> |
| MARY ELLEN VIGLIS, individually, and as personal representative of the ESTATE OF DEMETRIOS VIGLIS, a deceased individual; JAMES PASSANNANTI, individually, and as personal representative of ESTATE OF AVA PASSANNANTI, a deceased | |

individual; and ANNETTE GALLEGO, individually,

       Petitioners,

       v.

AMAZON.COM, INC., a Delaware corporation,

       Respondent.

WHITENER, J. – Four individuals, Mikael Scott, Tyler Muhleman, Demetrios Viglis, and Ava Passannanti (decedents), died by suicide by ingesting sodium nitrite they purchased from Amazon on the company's website, Amazon.com. The decedents' families and estates (Plaintiffs) seek review of the Court of Appeals' decision reversing the trial court's denial of Amazon's CR 12(b)(6) motions to dismiss for failure to state a claim for negligence under the Washington product liability act (WPLA), ch. 7.72 RCW. The Court of Appeals Division One held that Plaintiffs could not state a claim for relief under WPLA because suicide was a superseding cause. *Scott v. Amazon.com, Inc.*, 33 Wn. App. 2d 44, 559 P.3d 528 (2024). We disagree.

*Ruth Scott et al. v. Amazon.com, Inc.*, No. 103730-9

FACTUAL BACKGROUND

This case concerns two lawsuits brought against Amazon by the families and estates of Mikael Scott, Tyler Muhleman, Demetrios Viglis, and Ava Passannanti.[1] Clerk's Papers (CP) at 213-48, 379-422.

Amazon sells multiple brands of sodium nitrite on its website; only two brands are involved in this case: "Loudwolf Sodium Nitrite" and "HiMedia GRM417-500G Sodium Nitrite." CP at 381, 214. Each of the four decedents ingested the sodium nitrite they purchased from the Amazon website. According to Plaintiffs, sodium nitrite is used in laboratories for research and medical purposes, and it is also used in meat preservation. CP at 230. When used as a meat preservative, sodium nitrite is one of many ingredients. Curing salts typically call for sodium nitrite of 6.0 percent purity. HiMedia Sodium Nitrite is 98.0 percent pure and Loudwolf Sodium Nitrite is 99.6 percent pure. CP at 229-30, 381. Once ingested, sodium nitrite takes just minutes to produce enough methemoglobin to impair oxygen transport in the blood and cause hypoxia. CP at 229-30. Plaintiffs alleged that there is no legitimate household use for high purity sodium nitrite. CP at 230, 381, 401.

---

[1] The first suit was brought in 2022 by Mikael Scott's mother and his estate. Scott's complaint was later amended to include Tyler Muhleman's parents and estate. CP at 213-249. The second suit was brought in 2023 by Demetrios Viglis' and Ava Passannanti's parents and estates. CP at 379-422. These suits were consolidated under No. 84933-6-I. *See* Comm'r's Ruling Granting Discr. Rev. at 2 (Wash. Ct. App. Aug. 17, 2023).

Nineteen-year-old Demetrios Viglis purchased Loudwolf Sodium Nitrite from Amazon.com. CP at 382. On or around March 30, 2020, sodium nitrite was delivered to Demetrios' home, and on April 4, 2020, he died from sodium nitrite poisoning. *Id*. Eighteen-year-old Ava Passannanti purchased Loudwolf Sodium Nitrite from Amazon.com. *Id*. On December 15, 2020, it was delivered to her home, and on February 24, 2021, she died from sodium nitrite poisoning. CP at 382-83. Twenty-seven-year-old Mikael Scott purchased HiMedia Sodium Nitrite and a small scale from Amazon.com on December 21, 2020. CP at 215. Both products were delivered to his home two days later. *Id*. Sometime on December 27, 2020, Mikael was found dead from sodium nitrite poisoning. *Id*. Seventeen-year-old Tyler Muhleman purchased HiMedia Sodium Nitrite and Tagamet brand acid reducer from Amazon.com on May 22, 2021. CP at 216. On May 25, 2021, Tyler was found dead from sodium nitrite poisoning. *Id*.

Plaintiffs alleged that Amazon promoted the sale of sodium nitrite on its website alongside other products that would assist in carrying out suicide. CP at 214, 417. They contend that the Amazon website included recommended products, such as Tagamet to consumers who viewed sodium nitrite products. According to the Plaintiffs, Tagamet is an acid reduction medicine that suicide forums recommend purchasing to prevent life-saving vomiting that occurs when sodium nitrite is

4

ingested. CP at 214, 224, 226, 246, 380, 393, 396, 402. Other products Plaintiffs identified being recommended on Amazon's website to customers who viewed sodium nitrite products include a small scale and a book titled *The Peaceful Pill Handbook*. CP at 214, 224-25, 380, 394-95. Plaintiffs alleged that *The Peaceful Pill Handbook* is a suicide instruction book that devotes a chapter to lethal inorganic salts, which contains instructions on how to use sodium nitrite to die by suicide. CP at 225, 395. The book states that sodium nitrite is readily available online and provides a hyperlink to the sodium nitrite products on the Amazon webpage. CP at 225-26, 395. Plaintiffs alleged that Amazon routinely sent reminder e-mails, with advertisements for these products, to customers who viewed sodium nitrite products on the webpage. In addition, Plaintiffs contend that one-star customer reviews from grieving family members about how the sodium nitrite product was being used for suicide were deleted by Amazon. CP at 227-28, 398.

Amazon has no age verification method for account users who purchase sodium nitrite. CP at 220, 381. Plaintiffs contend that for years Amazon has been aware of the link and risks between sodium nitrite and suicide, and, even after becoming aware of the deaths it has caused, continues to sell consumers sodium nitrite, without any restrictions. CP at 238, 242, 243-45, 380-83. In support of these allegations, Plaintiffs state that as early as 2018, Amazon customer service channels

have been notified by parents of people who have died by suicide using sodium nitrite. CP at 381. In 2019, the National Poison Data System began reporting a spike in suicides caused by sodium nitrite. CP at 226, 396. In other countries, such as the United Kingdom, Amazon is legally required to control sales of sodium nitrite because of its categorization as a "reportable substance" and its prevalence in aiding suicide. CP at 226, 396-97, 416. On March 17, 2021, the U.S. Food and Drug Administration sent a letter informing Loudwolf and Amazon that the product purchased through Amazon was mislabeled and had been used for suicide purposes. CP at 383. Loudwolf immediately removed sodium nitrite from its Amazon storefront and from its own website. *Id*. Through at least October 2022, Amazon continued to sell sodium nitrite through other brands. CP at 382-83. As for HiMedia Sodium Nitrite, Plaintiffs alleged that Amazon continues to sell it. CP at 226.

According to Plaintiffs, the labels on HiMedia Sodium Nitrite and Loudwolf Sodium Nitrite fail to adequately inform consumers of its lethal nature or how to reverse the products' effects if ingested. Here, they state that Amazon cropped the product image of HiMedia Sodium Nitrite so no warnings or descriptions of the product are visible to customers viewing the product online. CP at 222. The HiMedia bottle does contain warnings and symbols; however, it has no description of how deadly the product is or how to reverse its effects. *Id*. The only warning language

contained on the Loudwolf Sodium Nitrite product label states, "HAZARD Oxidizer. Irritant." CP at 392. The product contains no warnings to consumers about how deadly the product is or how to reverse its effects. CP at 391-92.

Mikael Scott, after ingesting sodium nitrite, texted his mother, "'Vomiting is usually [ ] good as your bodies [*sic*] defense mechanism, especially if you feel better afterwards.'" CP at 233 (alterations in original). After Tyler Muhleman ingested sodium nitrite, emergency medical technicians arrived and tried to save him; however, when they checked the HiMedia bottle, they found no instructions for an antidote to reverse the product's effects. CP at 239. Demetrios Viglis, after ingesting sodium nitrite, texted one of his friends saying, "'Don't worry. I'll call you in the morning, my body is rejecting the poison.'" CP at 404. Ava Passannanti called the police after ingesting sodium nitrite, begging for immediate help, and cried out, "'Someone please help me! I don't know why I did this to myself! Please! Help me! Help me!'" CP at 407.

ISSUES

1.  Is the act of suicide, as a matter of law, a superseding cause in a negligence claim under WPLA?

2.  Do Plaintiffs state a claim for relief under WPLA and RCW 7.72.040(1)(a)?

ANALYSIS

"A trial court's ruling on a motion to dismiss for failure to state a claim upon which relief can be granted under CR 12(b)(6) is a question of law and is reviewed de novo by an appellate court." *Cutler v. Phillips Petrol. Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994). "The court presumes all facts alleged in the plaintiff's complaint are true and may consider hypothetical facts supporting the plaintiff's claims." *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). "Dismissal is proper only when we can determine, beyond a reasonable doubt, that there are no facts that would justify recovery." *Birnbaum v. Pierce County*, 167 Wn. App. 728, 732, 274 P.3d 1070 (2012). Courts should grant CR 12(b)(6) motions "'sparingly and with care' and 'only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to

relief.'" *Paradise, Inc. v. Pierce County*, 124 Wn. App. 759, 767, 102 P.3d 173 (2004) (quoting *Cutler*, 124 Wn.2d at 755).

1. The Washington product liability act

The "WPLA is the exclusive remedy for product liability claims." *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 409, 282 P.3d 1069 (2012) (citing *Potter v. Wash. State Patrol*, 165 Wn.2d 67, 87, 196 P.3d 691 (2008)). "Insofar as a negligence claim is product-based, the negligence theory is subsumed under the WPLA product liability claim." *Id.* The WPLA supplants common law claims or actions involving harm caused by a product; however, the act does not abrogate the common law. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 323, 858 P.2d 1054 (1993). When confronted with undefined terms in the WPLA, we turn to the common law. The WPLA recognizes this principle: "The previous existing applicable law of this state on product liability is modified only to the extent set forth in" the act. RCW 7.72.020(1); *Schwartz v. King County*, 200 Wn.2d 231, 240, 516 P.3d 360 (2022) (common law definitions fill the gaps legislative enactments do not cover). The WPLA provides for a negligence claim, but it does not define "negligence" or "proximate cause." Therefore, the common

law principles of negligence and proximate cause govern product seller liability claims under the WPLA.

Here, Plaintiffs assert that Amazon is a "product seller" under RCW 7.72.010(1). RCW 7.72.040(1) provides the relevant cause of action. Under the WPLA,

> a product seller … is liable to the claimant only if the claimant's harm was proximately caused by [one of the following]:
> (a) The negligence of such product seller; or
> (b) Breach of an express warranty made by such product seller; or
> (c) The intentional misrepresentation of facts about the product by such product seller or the intentional concealment of information about the product by such product seller.

RCW 7.72.040(1).

As an initial matter, the parties agree that WPLA incorporates common law principles of proximate cause and negligence. However, they disagree on whether the court is bound to apply only the common law that existed prior to the enactment of the WPLA in 1981. Amazon contends that this court is limited to looking only at pre-WPLA enactment case law. *Spokane Methodist Homes, Inc. v. Dep't of Lab. & Indus.*, 81 Wn.2d 283, 287, 501 P.2d 589 (1972) (holding that the Industrial Insurance Act could not be "automatically amended to conform to" any "new rule adopted by the court"); *see also Jongeward v. BNSF Ry. Co.*, 174 Wn.2d 586, 596,

278 P.3d 157 (2012) (interpreting "trespass" in RCW 64.12.030 using 1869 common law definitions of "trespass," as opposed to the modern view of "trespass"). Applying this logic, Amazon argues we must apply a case decided by this court almost 100 years ago and hold that Plaintiffs cannot state a claim for relief under the WPLA. *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 P. 436 (1930). We disagree. We have interpreted the WPLA using common law that postdates WPLA's enactment. *Ruiz-Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493, 504, 7 P.3d 795 (2000) (relying on *Restatement (Third) of Torts* § 2 (A.L.I. 1998) to determine the elements of a claim under RCW 7.72.030(1)); *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 753, 818 P.2d 1337 (1991) (relying on *Hartley v. State*, 103 Wn.2d 768, 698 P.2d 77 (1985), to define "proximate cause" in RCW 7.72.030(1)). Even if we were to accept Amazon's argument that we are bound by pre-1981 common law, *Arsnow* does not control.

In *Arsnow,* a taxicab struck and severely injured Harvey Arsnow. A jury declared a mistrial in Arsnow's personal injury lawsuit against the taxicab company. Shortly thereafter, Arsnow died by suicide. Arsnow's widow sued the taxicab and alleged that Arsnow's act of suicide was the result of the injuries he had sustained from defendant's negligent driving. *Arsnow*, 159 Wash. at 140-41. This court rejected plaintiff's argument and found:

> [L]iability may exist on the part of a person ... where the death of the person injured results from [their] own act committed in delirium or frenzy, and without consciousness or appreciation on [their] part of the fact that such act will in all reasonable probability result in [their] death, or when the act causing the death is the result of an uncontrollable impulse, resulting from a mental condition caused by the injuries.

*Id*. at 156.

In other words, this court determined that unless Arsnow's widow could show that the act of suicide was the result of an involuntary act brought about by the taxicab's alleged negligent conduct, then the element of proximate cause could not be established as a matter of law. *Id*. at 161-62. Arsnow's widow could not prove Arsnow's suicide occurred in delirium, frenzy, or as a result of an uncontrollable impulse caused by the injuries. *Id*. at 156-57. The *Arsnow* rule was reaffirmed 30 years later in *Orcutt v. Spokane County*, 58 Wn.2d 846, 364 P.2d 1102 (1961) (holding that plaintiff could use medical witness testimony to establish decedent's "uncontrollable impulse" to commit suicide in a wrongful death claim).

Here, Division One reasoned that there is no general duty to protect others from self-inflicted harm such as suicide. *Scott* 33 Wn. App. 2d at 62-63 (quoting and citing *Webstad v. Stortini*, 83 Wn. App. 857, 866, 924 P.2d 940 (1996)). *Webstad* is a Division Two case that relied on *Arsnow* and held that "[s]uicide is 'a voluntary willful choice determined by a moderately intelligent mental power[,] which knows

12

the purpose and the physical effect of the suicidal act.'" 83 Wn. App. at 866 [2] (second alteration in original) (internal quotation marks omitted) (quoting *Hepner v. Dep't of Lab. & Indus.*, 141 Wash. 55, 59, 250 P. 461 (1926)). "[T]he person committing suicide is in effect both the victim and the actor." *Id*. "[N]o duty exists to avoid acts or omissions that lead another person to commit suicide unless those acts or omissions directly or indirectly deprive that person of the command of [their] faculties or the control of [their] conduct." *Id*. (citing *Orcutt*, 58 Wn.2d at 850-53). Division One held that Plaintiffs cannot show Amazon's conduct proximately caused the decedents' suicides because "[o]ur Supreme Court determined nearly a century ago that liability does not attach to a death by suicide unless either there was a special relationship, which cannot be established here, or the decedent's decision to commit suicide was proximately caused by the defendant's negligence such that the suicide was not truly a voluntary act." *Scott*, 33 Wn. App. 2d at 68 (deriving this rule from *Arsnow*, 159 Wash. at 138-39).

---

[2] Because we are not bound by *Webstad*, I provide only a quick summary of the facts. Susan Webstad was in a romantic relationship with Joseph Stortini. During a dispute between the couple, Webstad ingested 10 blood pressure pills and assured Stortini that she would be fine and dissuaded him from seeking medical help. When Webstad became unconscious, Stortini immediately called 911. Webstad died in the hospital the next morning. Webstad's adult son sued Stortini for a wrongful death claim, and the court granted summary judgment to Stortini.

In *Hunt v. King County*, 4 Wn. App. 14, 481 P.2d 593 (1971), Division One provides a helpful discussion of *Arsnow*'s limits. In *Hunt*, the court rejected the hospital tortfeasor's argument that it could not be held liable for injuries resulting from a patient's suicide attempt because as a matter of law the act of suicide is a superseding cause. *Id*. *Hunt* reasoned that *Arsnow* and *Orcutt* were both cases where, absent proof of an uncontrollable impulse, suicide was deemed not a reasonable risk of harm resulting from defendant's allegedly negligent conduct. By contrast, in *Hunt*, the decedent's suicide risk was known to the hospital prior to the negligent act complained of and it was "a condition the known existence of which creates a duty to safeguard the plaintiff from the foreseeable consequences of its existence." *Id*. at 24. Here, Plaintiffs alleged a similar theory of negligence: that the decedents' suicide risk was known to Amazon prior to the negligent act complained of and it was "a" condition the known existence of which creates a duty to safeguard the four decedents from the foreseeable consequence of its existence. CP at 245-47, 417-18.

At this stage of these proceedings, we are to presume the facts as alleged are true. CR 12(b)(6). Taking the facts Plaintiffs have alleged as true, we are unable to say, as a matter of law, beyond a reasonable doubt, that the decedents' deaths were not proximately caused by Amazon's alleged tortious sales practices of the sodium nitrite. *In re Parentage of C.M.F.*, 179 Wn.2d 411, 418, 314 P.3d 1109 (2013)

14

(holding that dismissal under CR 12(b)(6) is appropriate only if it appears beyond a reasonable doubt that no facts exist that would justify recovery). The rule espoused in *Arsnow* that the act of suicide is a superseding cause as a matter of law does not control here. We hold that the act of suicide, as a matter of law, is not a superseding cause that precludes Plaintiffs' WPLA claims.

2. Do Plaintiffs state a claim for negligence under the WPLA?

Plaintiffs pursue a product seller negligence claim against Amazon under the WPLA. RCW 7.72.040(1)(a). Because the WPLA does not define "negligence," we look to the common law definition. To establish actionable negligence in common law requires (i) the existence of a duty, (ii) breach of that duty, (iii) harm or injury, and (iv) proximate causation between the breach and the resulting injury. *Hansen v. Wash. Nat. Gas Co.*, 95 Wn.2d 773, 776, 632 P.2d 504 (1981). The existence of a legal duty is a question of law for the court. *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d 752, 762, 344 P.3d 661 (2015). Once "a duty is found to exist from the defendant to the plaintiff then concepts of foreseeability serve to define the scope of the duty owed." *Id*. at 763 (citing *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 475, 951 P.2d 749 (1998)). If a duty is found, foreseeability defines the scope of the duty owed. *Id.* Foreseeability can be a question of whether duty exists and a

question of whether the harm is within the scope of the duty owed. In the latter sense, it is a question of fact for the jury. *Id*. at 764. Foreseeability principles determine whether the hazard that brought about or assisted in bringing about a plaintiff's injury is among the hazards reasonably within the scope of the defendant's negligent conduct. *Maltman v. Sauer*, 84 Wn.2d 975, 980, 530 P.2d 254 (1975) (quoting *Rikstad v. Holmberg*, 76 Wn.2d 265, 268, 456 P.2d 355 (1969)).

Division One correctly found that Amazon owes a duty to exercise reasonable care; however, the court incorrectly found that Plaintiffs could not establish the element of proximate cause due to our holding in *Arsnow*. *Scott*, 33 Wn. App. 2d at 66 (holding that "the existence of Amazon's duty of reasonable care to the purchasers here does not render the company responsible for [decedents'] self-harm"). Here, *Arsnow* does not control. Therefore, the remaining question is whether Plaintiffs have stated a claim for product seller negligence under the WPLA.

Applying the forgiving CR 12(b)(6) motion standard to Plaintiffs' allegations, we hold that Plaintiffs' complaints alleged sufficient facts to avoid dismissal of their product seller negligence claims under the WPLA. In Washington, every individual has a duty to exercise reasonable care to avoid the foreseeable consequences and harm from their acts. RESTATEMENT (SECOND) OF TORTS § 281 cmts. c, d (A.L.I.

16

1965); *see also Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 442 P.3d 608 (2019). "This duty requires actors to avoid exposing another to harm from the foreseeable conduct of a third party." *Washburn v. City of Federal Way*, 178 Wn.2d 732, 757, 310 P.3d 1275 (2013) (citing RESTATEMENT § 302).

Plaintiffs' complaints alleged that Amazon enhanced the risk of the decedents' deaths by its sales practices of sodium nitrite. CP at 213-45, 319-47. They alleged that how the Amazon website algorithm routed potential buyers of sodium nitrite to other products that would assist in suicide such as scales, a suicide instruction book, and antiemetics to prevent life-saving vomiting, contributed to the suicides of the four decedents. CP at 225-26, 394-95, 413. They alleged that Amazon was aware that sodium nitrite was being used for suicide by vulnerable consumers. CP at 196, 215, 381, 392-94, 410. They alleged that Amazon had actual knowledge from the parents of decedents and from a letter from Congress about the suicide risk associated with the sale of sodium nitrite. CP at 214-15, 236, 243, 390-92, 400-01, 414-15.

Whether harm falls within the scope of a duty turns on foreseeability and is generally a question of fact. *McKown*, 182 Wn.2d at 763-64. Here, whether Plaintiffs' harm, the act of suicide, is a harm within the foreseeable range of the duty

of reasonable care that Amazon owed the decedents is a question of fact. As such, it is for the fact finder to decide whether the harm of suicide was within the scope of Amazon's duty to Plaintiffs.

Amazon's arguments against finding that it owed a duty to exercise reasonable care are not persuasive. Amazon argues that it has no duty to exercise reasonable care to avoid the harm of its acts because the chattel's "'danger is obvious or known.'" Resp't's Suppl. Br. at 33 (quoting *Mele v. Turner*, 106 Wn.2d 73, 79-80, 720 P.2d 787 (1986)). The argument that Plaintiffs may have misused the product does not eliminate Amazon's duty. RESTATEMENT (SECOND) OF TORTS § 302B (arguments around misuse, assumption of risk, contributory negligence are affirmative defenses that defendants may raise). Amazon also argues that there is no "principled basis for defining what frequency of misuse triggers the duty to refrain from selling a product." Resp't's Suppl. Br. at 33. Amazon argues that to allow Plaintiffs' theory would violate long-standing precedent rejecting the notion that foreseeable "abuse" or "misuse" of a nondefective product justifies imposing liability for selling that product. *Id*. at 24-25, 33. We are at the CR 12(b)(6) stage of the proceedings. Denying Amazon's CR 12(b)(6) motion does not violate long-standing precedent about foreseeable "abuse" or "misuse" of nondefective products. Amazon is not foreclosed from asserting any affirmative defenses. Finally, Amazon

argues that a finding that Amazon owes Plaintiffs a duty would subject retailers to potential liability if they continued selling products after hearing one instance of misuse, and it would improperly allow juries to legislate whether a "'well-made product' 'should not be sold' because of potential 'misuse.'" *Id*. at 33 (quoting *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 135 n.14, 727 P.2d 655 (1986)). Amazon overstates what the trial court's order denying dismissal at this stage entails. A CR 12(b)(6) motion asks the court to assess the legal sufficiency of the allegations in a complaint. *Kinney*, 159 Wn.2d at 842; *McKown*, 182 Wn.2d at 763-64.

Amazon as a product seller has a legal duty to exercise reasonable care to avoid the foreseeable consequences and harm of selling sodium nitrite, and, within the duty, Amazon is required to avoid exposing purchasers of products on its website to harm from the foreseeable conduct of a third party. Foreseeability does not eliminate the duty owed, it just limits the scope of the duty. Whether the act of suicide was a foreseeable consequence and harm of the act of selling sodium nitrite to the decedents is a question of fact for the jury. At this CR 12(b)(6) stage of the proceedings, the Plaintiffs have stated a claim for product seller negligence under WPLA. We hold that Plaintiffs have stated a negligence claim under WPLA.

CONCLUSION

We reverse the Court of Appeals and reinstate the trial court's denial of Amazon's CR 12(b)(6) motions.

_____
Whitener, J.

WE CONCUR.

_____     _____
Stephens, C.J.

_____     _____
Johnson, J.

_____     _____
Madsen, J.

_____     _____
                                     Yu, J.P.T.

20

No. 103730-9

GONZÁLEZ, J. (concurring)— I concur with much in the majority opinion.  I

agree the plaintiffs' allegations are sufficient to overcome a motion to dismiss.  If

the plaintiffs can prove what they have pleaded, Amazon is subject to liability

under RCW 7.72.040(1)(a) and (c).  I agree the Washington products liability act

does not freeze the common law as of the time it was enacted in 1981.  I also agree

even under those pre-1981 cases, the plaintiffs' complaint should not be dismissed

under the "suicide rule."  Under the facts as pleaded here, it is for a jury to decide

whether suicide is an intervening, superseding cause that prevents or reduces any

of the defendant's liability. *See* majority at 12-13.  Accordingly, I agree the Court

of Appeals must be reversed and the trial court's denial of the motion to dismiss

affirmed.

I write separately, however, to stress that the allegations, taken as true, do

more than create a triable issue on whether Amazon was negligent in allowing

sodium nitrite to be sold to vulnerable people after being warned the product was

being misused for suicide. *See Washburn v. City of Federal Way*, 178 Wn.2d 732,

757, 310 P.3d 1275 (2013) (citing RESTATEMENT (SECOND) OF TORTS § 281 cmts.

*Scott et al. v. Amazon.com, Inc.*, No. 103730-9 (González, J., concurring)

c, d (A.L.I. 1965)); *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982) (quoting RESTATEMENT (SECOND) OF TORTS § 390). The plaintiffs also allege Amazon deliberately took actions that made it more likely vulnerable people would use the product to harm themselves. Most specifically, the plaintiffs allege:

> Amazon also assists in causing individuals to die by suicide through the way it markets Sodium Nitrite. Its recommendation feature for Sodium Nitrite *(i.e.,* "Customers who viewed this item also viewed" and "Frequently bought together") offers Tagamet, which is an acid reduction medicine that suicide forums recommend to prevent life-saving vomiting after ingesting a deadly dose of Sodium Nitrite. Also among Amazon's recommendations for viewers of Sodium Nitrite are small scales and the "Amazon Edition" of Dr. Philip Nitschke's suicide instruction book, "Peaceful Pill Handbook."

CP at 214.

In essence, the plaintiffs allege Amazon's recommendation algorithm marketed the tools to commit suicide to their vulnerable loved ones.

Algorithms are not neutral. Vera Eidelman, *The First Amendment Case for Public Access to Secret Algorithms Used in Criminal Trials*, 34 GA. ST. U. L. REV. 915, 923-25 (2018). The algorithms were created by Amazon to sell more products. The plaintiffs' allegations suggest that Amazon's algorithm marketed despair and a tortured death. I see no difference between marketing these products together online from putting sodium nitrite, antinausea drugs, scales, and the suicide manual together on the shelf. If the plaintiffs can prove what they have

2

pleaded, a rational trier of fact could find this was not merely negligent but reckless or intentional.

In my view, it is, at least, negligent for a product seller to sell a dangerous product when it knows it is being used by vulnerable people the way sodium nitrite was being used here without taking reasonable steps to prevent that use. Not taking those reasonable steps could give rise to liability under RCW 7.72.040(1)(a). It is, at the least, negligent to market a suicide kit to vulnerable people. Doing so could give rise to liability under RCW 7.72.040(1)(a) and even outside the Washington products liability act. *See* RCW 7.72.010(4). It is, at the least, negligent to remove or conceal information that would alert other customers to this misuse. Doing so could give rise to liability under RCW 7.72.040(1)(c).

With these observations, I respectfully concur.

_____
González, J.

No. 103730-9

MUNGIA, J. (concurring)—Our prior cases have allowed tortfeasors to escape liability where their actions were a cause of a person's suicide, except in limited circumstances. These holdings were premised on the rule that an entity will not be liable for an injury that a person voluntarily inflicts on themselves. These antiquated cases held that individuals "committed suicide," a phrase that we now understand as harmful because it suggests a person committed a culpable act or moral wrong if they ended their life.[1] This old understanding of suicide came with the notion that individuals were blameworthy for dying this way[2]—that they faced a choice between right and wrong, and chose the latter.[3] Rooted in this misconception of suicide and mental health, we have

---

[1] Accordingly, I use the phrase "death by suicide" or "dying by suicide" instead. *See* Susan Beaton, Peter Forster & Myfanwy Maple, *Suicide and Language: Why We Shouldn't Use the 'C' Word*, 35 INPSYCH (Feb. 2013), https://psychology.org.au/publications/inpsych/2013/february/beaton [https://perma.cc/RE2Y-6WMM].

[2] *See* Alex B. Long, *Abolishing the Suicide Rule*, 113 NW. U. L. REV. 767, 786, 810 (2019).

[3] For a harrowing example of this view, see *Blackstone's Commentaries*' discussion of suicide—a source that profoundly influenced American law. 4 WILLIAM BLACKSTONE, COMMENTARIES *189.

held that dying by suicide is, by legal definition, a "voluntary willful choice." Under a proximate cause analysis, this meant that suicide is a superseding cause that breaks the chain of causation and insulates a tortfeasor from liability. In my view, those decisions were wrong. The decision to end one's life is not a "voluntary" superseding act under our legal standards.

To be voluntary under the law, a decision must be made free of coercion or duress. While a decision to die by suicide is a choice in the sense that one chooses a course of action to end or prevent suffering, it is made under duress in response to overwhelming pain or pressure. The pain may be physical, mental, or emotional, and may stem from a variety of sources, but it is pain, nonetheless. There is a substantial amount of philosophical, psychological, and legal debate surrounding death by suicide, and it is not this court's role to choose sides. However, it seems to me that people who choose to end their lives believe in that moment that they do not have any meaningful, life-affirming alternative. Thus, the decision is not "voluntary" in the legal sense of the term.

This lawsuit, which is only at the pleading stage, raises the issue of whether a product seller has a duty to exercise reasonable care when it sells a product to the general public that has no household use and that if ingested leads rapidly to death, and when it knows the product is being misused by vulnerable people to end their lives by suicide. Specifically, whether that seller has a duty to exercise reasonable care under these three sections of *Restatement (Second) of Torts* (A.L.I. 1965): (1) to not facilitate the use of that product to end one's life, § 281, (2) to take reasonable steps to prevent the misuse of

the product by vulnerable people contemplating death by suicide, § 390, and (3) to warn purchasers of the immediate, painful, and likely irreversible consequences of the foreseeable misuse of the product, § 388.

If a duty exists, then a second issue is raised: whether death by suicide is a superseding cause that insulates the product seller from liability for a breach of that duty.

I would hold that sellers of this sort of product have all three of these duties. Further, the suicide rule should be overturned. The legal underpinnings of the rule have eroded, and the rule is incorrect and harmful. When a consumer uses a seller's product to end their life, a product seller is not automatically insulated from liability but is instead subject to Washington's general contributory fault scheme.

Accordingly, I concur with the result reached by the majority.

I.      SUICIDE IS A LEADING CAUSE OF DEATH IN THE UNITED STATES

Suicide is a leading cause of death for youth and adults in the United States.[4]  In 2023, it was the second leading cause of death among individuals between the ages of 10 and 34.[5]  Among adult age groups, the prevalence of serious thoughts of dying by suicide was highest among young adults aged 18 to 25.[6]  Statistics show 29.6 percent of women and 7.4 percent of men who died by suicide in 2023 did so by ingesting poison.[7]

---

[4] *Facts About Suicide*, U.S. CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 26, 2025), https://www.cdc.gov/suicide/facts/index.html [https://perma.cc/9WJU-MXHY].
[5] *Id.*
[6] *Mental Health Information: Suicide*, NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/statistics/suicide [https://perma.cc/LK8W-N5MV].
[7] *Id.*

Mental and physical health conditions can place a person at higher risk of wanting to die by suicide. Those conditions may include depression, substance use disorders, bipolar disorder, and anxiety disorders.[8] A person experiencing serious physical pain and traumatic brain injury are also more at risk for death by suicide.[9] Environmental conditions can also increase the risk of death by suicide. These include access to firearms and drugs, or prolonged stress from harassment, bullying, or abuse.[10]

Measures can be taken to prevent death by suicide.[11] Research reveals that many people planning to die by suicide realize immediately after attempting to end their life that they do not actually wish to die.[12] However, people having suicidal ideations may struggle to see meaningful alternatives to their problems, leading them to contemplate

---

[8] Matthew K. Nock, Irving Hwang, Nancy A. Sampson & Ronald C. Kessler, *Mental Disorders, Comorbidity and Suicidal Behavior: Results from the National Comorbidity Survey Replication*, 15 MOLECULAR PSYCHIATRY 868-76 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2889009/pdf/nihms-101809.pdf.

[9] Brian K. Ahmedani et al., *Major Physical Health Conditions and Risk of Suicide*, 53 AM. J. PREVENTATIVE MED. 308 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5598765/pdf/nihms866684.pdf.

[10] Johan Bilsen, *Suicide and Youth: Risk Factors*, 9 FRONTIERS IN PSYCHIATRY (2018), https://doi.org/10.3389/fpsyt.2018.00540.

[11] J. John Mann et al., *Improving Suicide Prevention Through Evidence-Based Strategies: A Systematic Review*, 178 AM. J. PSYCHIATRY 575-672 (2021), https://psychiatryonline.org/doi/full/10.1176/appi.ajp.2020.20060864.

[12] Catherine E. Bonn, *Suicide and the State: The Ethics of Involuntary Hospitalization for Suicidal Patients* 3 INTERSECT 40, 44 (2010), https://ojs.stanford.edu/ojs/index.php/intersect/article/view/197/101/ [https://perma.cc/2QP4-8CSG].

ending their lives.[13]  People who contemplate dying by suicide often experience intense emotional pain, hopelessness, and have a negative view of life or their future.[14]

While the ethical and moral debate around suicide remains unresolved, it is a fact that our society has devoted substantial resources to keep people from making the decision to die by suicide, with notable exceptions.[15]  Our society is particularly concerned about addressing rising incidents of youth suicides.[16]

II.     TAKING THE PLAINTIFFS' ALLEGATIONS AS TRUE, AMAZON SOLD A PRODUCT TO THE GENERAL PUBLIC, KNOWING IT MIGHT BE USED IN A WAY THAT WOULD RESULT IN SERIOUS HARM TO THE USER

At the CR 12(b)(6) stage of proceedings, a trial court must accept all allegations in the plaintiffs' complaint as true.  *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007).  The following are the plaintiffs' allegations:

- Amazon sold sodium nitrite on its website at a low price with quick home delivery to any consumer.

---

[13] *Id.* at 44-45.

[14] Maria Cristina Verrocchio et al., *Mental Pain and Suicide: A Systematic Review of the Literature*, 7 FRONTIERS IN PSYCHIATRY (2016), https://www.frontiersinorg/journals/psychiatry/articles/10.3389/fpsyt.2016.00108/full.

[15] Several states, including Washington, provide the limited ability for an adult suffering from a terminal illness to end their life with the help of self-administered medication.  *See* the Washington Death with Dignity Act, ch. 70.245 RCW.  Chapter 70.245 RCW prescribes strict rules as to when such deaths can occur and regulations for how those deaths may take place.  *See also* Kevin M. Simmons, *Suicide and Death with Dignity*, 5 J.L. & BIOSCIENCES 436, 436-37 (2018); Angela Onkay Ho, *Suicide: Rationality and Responsibility for Life*, 59 CAN. J. PSYCHIATRY 141, 143-44 (2014).

[16] Eva Cornman, *Youth Suicide is on the Rise: Yale Aims to Save Lives*, YALE SCH. OF MED. (Sep. 11, 2024), https://medicine.yale.edu/news-article/youth-suicide-is-on-the-rise-yale-aims-to-save-lives/ [https://perma.cc/336D-VLL3].

- Pure sodium nitrite is an industrial grade product that looks like salt. It has no household use.

- A person who ingests sodium nitrite will die.

- Amazon has never restricted sodium nitrite sales to adults or to commercial buyers.

- Amazon promoted the sale of sodium nitrite.

- Amazon's algorithm directed potential buyers of sodium nitrite to the "Amazon Edition" of a handbook on how to use sodium nitrite for suicide, a scale to weigh the poison, and antiemetics to prevent the consumer from vomiting after consuming sodium nitrite. Clerk's Papers (CP) at 225-26, 394-95, 413.

- Amazon's search engine would suggest the prompt "sodium nitrite suicide" for users that typed in "sodium nitrite" or "sodium nitrites." CP at 399.

- Amazon knew that ingestion of sodium nitrite was lethal.

- Amazon knew that Sanctioned Suicide, a group that advocates dying by suicide, promoted Amazon.com for the purchase of sodium nitrite to use for suicide.

- Amazon knew as early as 2018 that young people were buying sodium nitrite from its online marketplace to end their lives.

- After 2018, Amazon received a letter from Congress warning about sodium nitrite and youth suicides.

- After 2018, Amazon complied with foreign governments' bans and restrictions on sodium nitrite sales because of people using it to end their lives.

- After 2018, Amazon was aware of a *New York Times* investigation of sodium nitrite and youth suicides.

- Amazon continued to sell sodium nitrite in the United States after being informed of the high incidence of sodium nitrite being sold to teens and other people experiencing suicidal thoughts.

- One-star reviews and comments containing the word "suicide" were removed from the sodium nitrite product pages on Amazon.com.

- eBay and Etsy removed sodium nitrite from their websites in 2019 and 2020, respectively.

- Loudwolf, one of Amazon's sodium nitrite suppliers, stopped selling sodium nitrite on Amazon's site when it learned of youth using the product to end their lives. This occurred before one of the decedents in this case died by suicide.

- The four decedents in this case sought help from parents, called 911, made themselves vomit, or otherwise evidenced a desire to stop the poisoning caused by the ingestion of sodium nitrite.

- Amazon did not issue warnings, nor did the sodium nitrite bottles warn, that ingestion of even a small amount of sodium nitrite would result in the user's agonizing death in 20 minutes.

- Amazon owned and possessed the sodium nitrite sent to two of the decedents in this case.

In addition to the plaintiffs' allegations, the following is known about sodium nitrite:

Sodium nitrite is an odorless, lightly colored, crystalline powder similar to kitchen salt.[17]  A dose of 2.6 grams is lethal for a typical adult.[18]  However, doses as low as 0.7 grams have been reported to have been lethal.[19]  In other words, as little as half a teaspoon or less is fatal.

There have been increased incidents of adolescents using sodium nitrite to die by suicide.[20]  Information on how to access and use sodium nitrite for suicide has become more widely disseminated through social media and online forums such as "Sanctioned Suicide."[21]  One recent study found that sodium nitrite was the most used means of dying by suicide discussed on that forum.[22]

### III.    SUICIDE IS NOT "VOLUNTARY" IN THE LEGAL SENSE OF THE TERM

Amazon moved under CR 12(b)(6) to dismiss the plaintiffs' claims as a matter of law.  In other words, Amazon alleged that there were no facts that the plaintiffs could

---

[17] Adiba M. Matin, Eric T. Boie & Gregory P. Moore, *Survival After Self-Poisoning with Sodium Nitrite: A Case Report*, 3 J. AM. COLL. EMERGENCY PHYSICIANS OPEN (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8931305/.

[18] Edoardo Mazzini & Alessandro Feola, et al., *Suicide by Sodium Nitrite Ingestion: A Systematic Review*, FORENSIC SCI., MED. & PATHOLOGY (Aug. 2025), https://link.springer.com/article/10.007/s12024-025-01066-9 [https://perma.cc/RA7L-Q82Y].

[19] Sudeshna Das et al., *Emerging Trends of Self-Harm Using Sodium Nitrite in an Online Suicide Community: Observational Study Using Natural Language Processing Analysis*, 11 JMIR MENTAL HEALTH 1, 2 (May 2, 2024), https://mental.jmir.org/2024/1/e53730/PDF [https://perma.cc/F7MR-P2GG].

[20] *Id.*

[21] *Id.*

[22] *Id.* at 5.

prove, consistent with the complaint, that would entitle them to relief. *See Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978). The trial court denied Amazon's motion. The Court of Appeals reversed. In reaching its decision, the Court of Appeals concluded that there was no set of facts, even hypothetical facts,[23] that the plaintiffs could prove that would allow them to recover against Amazon.

The Court of Appeals correctly recognized that Amazon has a duty to reasonably avoid the foreseeable consequences of its acts. *Scott v. Amazon.com, Inc.*, 33 Wn. App. 2d 44, 65-66, 559 P.3d 528 (2024). However, the Court of Appeals erred in holding that the plaintiffs could not establish a duty or proximate cause as a matter of law because the decedents died by suicide. The Court of Appeals relied on *Webstad v. Stortini*, 83 Wn. App. 857, 865-66, 924 P.2d 940 (1996), to reach its conclusion. *Scott*, 33 Wn. App. 2d at 66-67. However, *Webstad* does not control here. More importantly, its holding was based on a faulty premise.

The *Webstad* court held that there is no general duty to protect others from self-inflicted harm like suicide "because the intentional and deliberate nature of suicide is similar to an unforeseeable intervening act." 83 Wn. App. at 866. The court defined suicide as "'a voluntary willful choice determined by a moderately intelligent mental power[,] which knows the purpose and the physical effect of the suicidal act.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Hepner v. Dep't of*

---

[23] *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995).

*Lab. & Indus.*, 141 Wash. 55, 59, 250 P. 461 (1926)). The legal characterization of suicide as a "voluntary willful choice" is outdated and wrong.

Dying by suicide is not a voluntary choice in the legal sense of the term. Instead, it is a decision that is made under duress. In the vast majority of cases, a person's decision to end their life is connected to physical, mental, or emotional pain—they are experiencing more pain than they believe they can cope with. People who choose to die by suicide do not see any viable, life-affirming alternative. A decision made under duress is not a voluntary one.

This principle is well established. In the law, we often look to determine whether a person has voluntarily made a decision, for example, a voluntary waiver of rights. Our case law has consistently held that to be voluntary, a decision must be made free from duress or coercion. For instance, a guilty plea is involuntary if it is obtained by mental coercion overbearing a defendant's will. *State v. Watson*, 159 Wn.2d 162, 165, 149 P.3d 360 (2006) (citing *Brady v. United States*, 397 U.S. 742, 757, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970)); *State v. Snider*, 199 Wn.2d 435, 444, 508 P.3d 1014 (2022). Or an employment agreement is involuntary if the employee enters into it because they are threatened with termination otherwise. *See Adler v. Fred Lind Manor*, 153 Wn.2d 331, 350, 103 P.3d 773 (2004). In addition, duress is a defense that excuses an otherwise criminal act when the defendant lacks control over the circumstances. *State v. Riker*, 123 Wn.2d 351, 368, 869 P.2d 43 (1994). We have consistently held that a person does not make a voluntary, willful choice when it is made under undue pressure.

To illustrate, signing a confession may or may not be a voluntary, willful choice. If it is made freely, knowingly, and without duress or mental incapacity, then it is voluntarily made. *See State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008). In contrast, if a person is continually given painful electrical shocks and then told that the shocks will be stopped if they sign a confession, no one would say that the choice to sign was voluntarily made. Yet, the person had a choice: continue to be in unbearable pain or stop the pain by signing the confession.

While the decision to end one's life is a choice, it is not voluntary as that term is used in the law. The decision is a highly individualized one. However, a common experience for people who choose to end their life is that they do not see any viable alternative. The pain or pressure they face is coercive in nature.

The belief that deciding to die by suicide is a voluntary, willful choice is an outdated notion. *Webstad* failed to take into account the extreme duress accompanying a person's decision to take their life and the coercive nature of that duress. The Court of Appeals improperly relied on the holding in *Webstad* to conclude that the plaintiffs could not establish duty or proximate cause because the decedents died by suicide. Amazon owed the plaintiffs a duty of reasonable care. Death by suicide does not negate that duty.

IV.     AMAZON OWED A DUTY TO CUSTOMERS PURCHASING SODIUM NITRITE

Under our common law tort principles, Amazon owed the following duties to the decedents:

11

Amazon owed the decedents the duty to take reasonable steps to prevent people

contemplating death by suicide from foreseeably misusing industrial grade sodium nitrite.

RESTATEMENT (SECOND) OF TORTS § 281.

Amazon owed a duty not to provide sodium nitrite to consumers who it knew were

likely to misuse the product for suicide because of their vulnerabilities. RESTATEMENT

(SECOND) OF TORTS § 390.

Amazon owed a duty to the plaintiffs to provide warnings as to the lethality,

irreversible effects, and extreme pain that occur from ingesting sodium nitrite.

RESTATEMENT (SECOND) OF TORTS § 388.

A. *Restatement (Second) of Torts* § 281: Duty of Reasonable Care

Actors have a general duty to exercise reasonable care to avoid the foreseeable

consequences of their acts. *See Washburn v. City of Federal Way*, 178 Wn.2d 732, 757,

310 P.3d 1275 (2013) (citing RESTATEMENT (SECOND) OF TORTS § 281 cmts. c, d).

Because the Washington products liability act incorporates common law negligence,

sellers have a duty to act with reasonable care to avoid causing foreseeable harm to

consumers. RCW 7.72.040(1)(a); *see Beltran-Serrano v. City of Tacoma*, 193 Wn.2d

537, 550, 442 P.3d 608 (2019); *see also Schooley v. Pinch's Deli Mkt., Inc.*, 80 Wn. App.

862, 874, 912 P.2d 1044 (1996) ("We conclude that a commercial vendor's duty to

exercise reasonable care when selling alcohol to possible minors is bounded by

foreseeability, and that the class protected by such duty includes those minors foreseeably

put as risk by the vendor's conduct."). Thus, Amazon had a duty to act with reasonable care when selling products that would foreseeably cause harm to purchasers.

From the allegations that the plaintiffs have made, Amazon owed two duties to the decedents:

1.      As a product seller, to not facilitate foreseeable death by suicide. Taking the allegations as true, Amazon violated that duty by (1) selling a product that has no household use, which it knew was being used by consumers to end their lives, (2) linking sodium nitrite to other products used for death by suicide, (3) providing immediate delivery of the product directly to the consumers' homes, and (4) omitting warning information.

2.      As a product seller, to take reasonable steps to prevent the misuse of industrial grade sodium nitrite by the general public that it knew was being used by consumers to end their lives.

Amazon allegedly knew that a number of its customers were buying sodium nitrite from its website to end their lives. Amazon's algorithms recommended other products to purchasers of sodium nitrite to assist in suicide, including handbooks on how to use sodium nitrite for suicide, scales to weigh sodium nitrite, and antiemetics to prevent the user from vomiting after consuming sodium nitrite. Amazon's search engine also suggested the prompt "sodium nitrite suicide" when customers typed in "sodium nitrite." In addition, Amazon was aware of the growing national and international concern that sodium nitrite was being purchased, particularly by youths, to die by suicide. Yet,

Amazon continued to promote the sale of sodium nitrite on its website and delivered it

directly to individuals who used it to end their lives.

The plaintiffs have alleged sufficient facts by which it is possible for them to

prevail under this negligence theory.

B. *Restatement (Second) of Torts* § 390: Negligent Entrustment

Amazon owed a duty to avoid providing products to people it knew, or should

have known, were unable to safely use them because of their vulnerabilities.[24] *See*

RESTATEMENT (SECOND) OF TORTS § 390; *Hickle v. Whitney Farms, Inc.*, 148 Wn.2d

911, 926, 64 P.3d 1244 (2003).  This duty falls under the long-standing common law

doctrine of negligent entrustment.  *Id.  Restatement (Second) of Torts* § 390 provides:

> One who supplies directly or through a third person a chattel for the use of
> another whom the supplier knows or has reason to know to be likely
> because of his youth, inexperience, or otherwise, to use it in a manner
> involving unreasonable risk of physical harm to himself and others whom
> the supplier should expect to share in or be endangered by its use, is subject
> to liability for physical harm resulting to them.

Our court and other jurisdictions have held that when a seller knows or has reason

to know of these vulnerabilities and provides someone with a product they are likely

unable to safely handle, they may be liable for negligent entrustment.  *See Bernethy v.*

*Walt Failor's, Inc.*, 97 Wn.2d 929, 931-34, 653 P.2d 280 (1982); *see also Rains v. Bend*

*of the River*, 124 S.W.3d 580, 597 (Tenn. Ct. App. 2003) ("While negligent entrustment

---

[24] *Restatement (Second) of Torts* § 390 is titled "Chattel for Use by Person Known to be
Incompetent" and refers to people who may be likely to use chattel in a manner involving
unreasonable risk of harm because of their "youth, inexperience, or otherwise."  I use the term
"vulnerable" instead of "incompetent."

claims usually arise in the context of a bailment, it is now widely agreed that the merchants may be considered to be suppliers of chattels.").

For example, in *Bernethy*, we held a gun shop owner could be liable under § 390 when he gave a gun and ammunition to a visibly intoxicated person who immediately left and shot someone. 97 Wn.2d at 931-34. The gun shop owner should have known the man would likely use the gun in a way involving an unreasonable risk of harm due to his intoxication. *Id.* at 932-34.

While in *Bernethy* we held a § 390 duty may apply to a retailer who sold a dangerous product to a visibly vulnerable person, the duty also applies to online retailers. Nothing in § 390 requires the supplier to directly observe a user's vulnerabilities to be held liable. Instead, the linchpin of the § 390 duty is that the defendant knows or should know that the consumer is vulnerable and because of that vulnerability is likely to use a product in a way involving an unreasonable risk of physical harm.

Here, the plaintiffs have alleged that Amazon had reason to know that the purchasers were unable to safely use sodium nitrite because of their vulnerabilities. As noted above, people who are contemplating ending their lives, by definition, are vulnerable. They are vulnerable because they are experiencing more pain than they believe they can cope with. They are vulnerable because they do not see any other viable option than to end their lives. Amazon had reason to know that the purchasers were likely to use the product in a dangerous manner because of their vulnerabilities.

C. *Restatement (Second) of Torts* § 388: Duty To Warn for a Product Known To Be Dangerous for Intended Use

Suppliers have a duty to use reasonable care to warn purchasers about the known dangers of the products they are selling.

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous

RESTATEMENT (SECOND) OF TORTS § 388. The plaintiffs must meet all three requirements to succeed on a § 388 claim. *Mele v. Turner*, 106 Wn.2d 73, 79, 720 P.2d 787 (1986). The plaintiffs have alleged facts that, if proved, would satisfy all three requirements.

First, the plaintiffs allege that Amazon knew the sodium nitrite it was supplying was being used for suicide—an obviously dangerous use. Second, the plaintiffs allege that Amazon could not reasonably believe that the purchasers of the industrial-grade sodium nitrite would fully understand how quickly it would cause death, the irreversible

nature of the poison, and the pain felt after ingesting sodium nitrite.[25] Amazon knew

sodium nitrite was increasingly used by youths to die by suicide. We have consistently

acknowledged that "hallmark features" of youth are "'immaturity, impetuosity, and

failure to appreciate risks and consequences.'" *State v. Carter*, 3 Wn.3d 198, 212, 548

P.3d 935 (2024) (internal quotation marks omitted) (quoting *State v. Houston-Sconiers*,

188 Wn.2d 1, 23, 391 P.3d 409 (2017)).

Third, the plaintiffs allege that the warning labels on the sodium nitrite and on

Amazon's website were insufficient to address the dangerousness of the chemical.

The question at this stage is not whether the plaintiffs will succeed on these claims

but, instead, whether there is some set of facts, consistent with the plaintiffs' complaint,

that would allow them to prevail. Plaintiffs have alleged facts that, if proved, would

result in Amazon having owed duties to the decedents under their *Restatement* § 281,

§ 390, and § 388 negligence theories.

V.    THE SUICIDE RULE'S LEGAL UNDERPINNINGS HAVE ERODED, AND THE RULE IS
INCORRECT AND HARMFUL

As noted above, the Court of Appeals held that death by suicide was a superseding

cause that would negate any breach of duty owed to the decedents. In other words,

Amazon could not be liable even if it was in part responsible for the decedents' deaths

---

[25] Plaintiffs allege the decedents did not realize the irreversible harm of ingesting the sodium nitrite bought on Amazon. Decedent Demetrios Viglis texted a friend after ingesting the sodium nitrite, "'Don't worry. I'll call you in the morning, my body is rejecting the poison.'" CP at 404. Mikael Scott texted his mother after ingesting the sodium nitrite, "'Vomiting is usually [ ] good as your bodies [*sic*] defense mechanism, especially if you feel better afterwards.'" CP at 233 (alterations in original).

17

because they died by suicide. I disagree. Death by suicide is not a voluntary, willful

choice under a proximate cause analysis and, accordingly, is not a superseding cause.

I would hold that the suicide rule is no longer good law in Washington, both

because the rule's legal underpinnings have eroded and because the rule is incorrect and

harmful.

A. <u>The Suicide Rule's Legal Underpinnings Have Eroded Since the Adoption of Comparative Fault</u>

An overview of proximate cause and the history of the suicide rule will be useful

in explaining why the suicide rule's legal underpinnings have eroded.

Proximate cause includes two elements: cause in fact and legal causation. *Baughn*

*v. Honda Motor Co.,* 107 Wn.2d 127, 142, 727 P.2d 655 (1986). Cause in fact refers to

the physical connection between an act and the injury and is a question generally left to

the jury. *Id.* Only when facts are undisputed and the inferences from them are

"incapable of reasonable doubt or difference of opinion" can cause in fact become a

question of law for the court. *Id.* Legal causation is a question of law for the court based

on policy considerations of whether liability should extend to the defendant's act. *Id.* at

146.

There can be more than one "but-for" cause of an injury. *State v. Frahm*, 193

Wn.2d 590, 600, 444 P.3d 595 (2019). However, if a new, independent act breaks the

chain of causation, it is a superseding cause that may relieve a defendant of liability.

*Crowe v. Gaston*, 134 Wn.2d 509, 519, 951 P.2d 1118 (1998). Whether an act is a

superseding cause is generally a question of fact. *Id.* at 519-20. The fact finder must

determine whether the intervening act broke the causal connection and was reasonably foreseeable by the defendant. *Id.* An act may be a superseding cause as a matter of law only when the intervening act is so highly extraordinary or unexpected that no reasonable minds can differ. *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 953, 509 P.3d 306 (2022). Otherwise, the question of whether an act is a superseding cause is left to the jury to decide.

We have twice held that a defendant cannot be held liable for death by suicide when the decedent appreciates the nature of the act. *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 161-62, 292 P. 436 (1930); *Orcutt v. Spokane County*, 58 Wn.2d 846, 852, 364 P.2d 1102 (1961). Our reasoning was that a person who ends their life by suicide does so voluntarily and willfully and, as such, that volitional act was a new, superseding cause of the death that broke the causal chain. *Arsnow*, 159 Wash. at 147. As discussed, I believe this reasoning is wrong and cannot stand today.

In addition, the suicide rule was born out of the era of contributory fault—where a plaintiff could not recover as a matter of law if they were a cause of their own injuries. Prior to 1974, a plaintiff recovered either "all or nothing" in their tort cases.[26] If a party's contributory negligence was a proximate cause of their injury, they were completely barred from recovery. This meant that in a wrongful death action, a personal

---

[26] Joel E. Smith & Alan D. Campbell, Recent Development, *Comparative Negligence*, 49 WASH. L. REV. 705, 705-07 (1974).

representative could not recover if the decedent contributed to their own death, even in the slightest.

In 1973, the Washington Legislature replaced contributory negligence with the increasingly popular comparative negligence scheme. LAWS OF 1973, 1st Ex. Sess., ch. 138. Parties were no longer barred from recovery if they contributed to their death or injury. Instead, damages were to be diminished in proportion to the percentage of negligence attributable to the recovering party. Comparative negligence stands today and extends to wrongful death actions. RCW 4.22.005; *see also* RCW 4.22.020 (the contributory fault of the decedent is imputed to the claimant in a wrongful death action).

Thus, the suicide rule is an outlier in how we analyze fault under our comparative negligence framework. It is an odd exception to the general rule that superseding cause is a question of fact for the jury. We have not squarely addressed the suicide rule since *Orcutt*, which was decided before Washington's shift to comparative negligence.[27] Now, as a matter of law, there may be multiple proximate causes of an injury, even when the decedent's actions is one of them.

We may abandon our precedent when its legal underpinnings have changed or disappeared altogether, as is the case here. *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014). The suicide rule does

---

[27] Indeed, in *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 643-44, 244 P.3d 924 (2010) (plurality opinion), we held that a jailer was not immune from liability under our comparative fault regime when an inmate died by suicide. This holding suggests we have departed from the suicide rule.

not stand in our modern comparative negligence regime, where a decedent's contributory fault no longer bars recovery as a matter of law. On that basis, we should overturn the antiquated suicide rule articulated in *Arsnow* and *Orcutt*.

B. The Suicide Rule Is Incorrect and Harmful

The suicide rule should also be overturned because it is incorrect and harmful. *Id.* While we do not lightly overturn precedent, there is a clear showing of both here. *Id.*

1. *The Suicide Rule Is Incorrect in Light of RCW 4.22.005*

First, the rule is incorrect because it goes against the legislature's mandate that a claimant's contributory fault does not bar recovery. RCW 4.22.005. As discussed above, the suicide rule bars recovery based on the decedent's fault, which is a vestige of the contributory fault era. Since we decided *Arsnow* and *Orcutt*, the legislature has enacted a comparative fault regime. The legislature clearly expressed that the new comparative fault laws "appl[y] whether or not under prior law the claimant's contributory fault constituted a defense or was disregarded under applicable legal doctrines." *Id.* Thus, chapter 4.22 RCW superseded preexisting laws like the suicide rule that precluded a plaintiff from recovery purely because they were partially at fault. In light of Washington's current contributory fault regime, the suicide rule is incorrect.

2. *The Suicide Rule Is Harmful: It Immunizes Tortfeasors from Liability and Perpetuates Stigmas Around Mental Health*

Second, the suicide rule is harmful for several reasons. As a preliminary matter, the rule immunizes tortfeasors from liability where the decedent died by suicide. We have held that "'absent express statutory provision, or compelling public policy, the law

21

should not immunize tortfeasors or deny remedy to their victims.'" *Keene v. Edie*, 131

Wn.2d 822, 832, 935 P.2d 588 (1997) (quoting *Freehe v. Freehe*, 81 Wn.2d 183, 192,

500 P.2d 771 (1972)). Here, there is no express statutory provision or compelling public

policy reason to bar recovery when the decedent died by suicide. On the contrary, the

rule undermines key policy interests underlying tort liability, like holding wrongdoers

accountable, increasing public safety, and ensuring a fair distribution of risk. *See*

*Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 407, 241 P.3d 1256 (2010)

(Chambers, J., concurring). Harm is done to those who have lost loved ones to suicide

and cannot seek recovery or accountability. More broadly, harm is done to the public

when tortfeasors are not held accountable for their failure to exercise reasonable care.

Holding that suicide is a superseding cause as a matter of law is also harmful

beyond the facts of this case. For example, other jurisdictions have applied the suicide

rule to dismiss actions where someone who has endured repeated abuse takes their life as

a result. *See, e.g.*, *Lancaster v. Montesi*, 216 Tenn. 50, 52, 390 S.W.2d 217, 219 (Tenn.

1965) (court order); *Laytart v. Laytart*, No. 5-94-11, 1994 WL 463777, at *1 (Ohio Ct.

App. Aug. 26, 1994). The suicide rule was also used to bar recovery when a minor

accessed his stepfather's gun and shot himself. *Tonn v. Moore*, No. 1 CA-CV 12-0372,

2013 WL 1858773, at *1 (Ariz. Ct. App. Apr. 23, 2013) (court order). In that case, the

stepfather stored the gun in an unlocked case in his closet with the ammunition "hidden"

under a pile of clothes in the same closet. *Id.* Yet, the decedent child's father was barred

from holding the stepfather accountable in negligence because the child's suicide was

deemed a superseding cause as a matter of law. *Id.* While we have not been faced with cases like these, the suicide rule would likely bar recovery in similar cases.

In addition, the suicide rule is based on outdated understandings of mental health. The rule treats suicide as "an incident isolated to the deceased" instead of recognizing suicide as a "potentially foreseeable tragedy with causes both internal and external to the deceased."[28] The suicide rule fails to account for the variety of factors that can lead to someone taking their life by suicide.[29] *Arsnow* and *Orcutt* portray suicide as a fully deliberate, voluntary choice, with a limited exception for people who end their life in a "delusion" or "frenzy." This binary is far from reality. Mental health is much more nuanced.

In addition, the concepts of "insanity," "delusion," "frenzy," and "uncontrollable impulse" underlying the suicide rule exception perpetuate harmful stigmas.[30] For instance, "stereotypes such as appearing dangerous, unpredictable, or culpable for their illness can make people with mental illness [be] perceived inaccurately as dangerous or to blame for their condition, both internally and externally."[31] These court-created

---

[28] *See* John W. Toomey, *The Causes of Minor Suicide: How the Restatement Approach to Foreseeability & Scope of Liability Fails to Act as a Deterrent*, 49 AM. J.L. & MED. 396, 397 (2024).

[29] *See* Domenico De Berardis, Giovanni Martinotti & Massimo Di Giannantonio, *Understanding the Complex Phenomenon of Suicide: From Research to Clinical Practice*, 9 FRONTIERS IN PSYCHIATRY (Mar. 2018), https://www.frontiersin.org/journals/psychiatry/articles/10.3889/fpsyt.2018.00061/full.

[30] *See* Long, *supra*, at 811-12.

[31] Ahmed A. Ahad, Marcos Sanchez-Gonzalez & Patricia Junquera, *Understanding and Addressing Mental Health Stigma Across Cultures for Improving Psychiatric Care: A Narrative Review*, 15 CUREUS (2023), https://www.cureus.com/articles/159889-understanding-and-

standards of "delusion," "frenzy," and "uncontrollable impulse" are not grounded in modern medical knowledge.[32]  These terms are purely legal terms, not medical terms. Upholding the outdated suicide rule and its exception incorporates injurious medical fictions into our law.

Moreover, the suicide rule is rooted in negative value judgments against those who die by suicide.  There are examples of states historically using forms of the suicide rule to bar parties from recovering because they participated in the "'immoral or illegal act'" of suicide.  *Wackwitz v. Roy*, 244 Va. 60, 64, 418 S.E.2d 861, 864 (Va. 1992) (quoting *Miller v. Bennett*, 190 Va. 162, 164-65, 56 S.E.2d 217, 218 (1949)); *see also Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo County*, 235 W. Va. 283, 294, 773 S.E.2d 627, 638-39 (W. Va. 2015) (Loughry, J., dissenting) (noting that this rule has been adopted in 13 jurisdictions); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001).  While general tort principles allow a plaintiff to recover even if they engaged in unwise or dangerous conduct, the suicide rule creates a different category of tort victims:  a category is deemed less deserving of recovery because of a choice that was made.  We should not uphold a rule rooted in these harmful moralistic judgments, painting those who experience suicidal ideation as somehow more blameworthy or culpable for their choices.

---

addressing-mental-health-stigma-across-cultures-for-improving-psychiatric-care-a-narrative-review#!/ [https://perma.cc/FQ7W-S9RK].

[32] *See id.*; *see also* Victor E. Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry*, 24 VAND. L. REV. 217, 234 (1971).

Altogether, the suicide rule should be overturned because (1) its legal underpinnings have eroded and (2) it is incorrect and harmful. The characterization of suicide as a "voluntary willful choice" as a legal matter is based on outdated understandings of mental health and was situated in our old contributory fault regime. The suicide rule is incorrect under our comparative fault scheme, which provides that a party's contributory negligence does not bar their recovery. The rule is also harmful in many ways, such as by immunizing tortfeasors and perpetuating dangerous misconceptions about mental health. For these reasons, we should overrule the suicide rule in *Arsnow* and *Orcutt.*

VI.    CONCLUSION

Taking all the plaintiffs' allegations as true, Amazon knew that it was selling a product that had no household use and that people were using it to end their lives. Amazon knew that other Internet sellers had discontinued selling industrial grade sodium nitrite because it was being used in this manner. Amazon's algorithm linked products that could be used together with sodium nitrite to facilitate death by suicide. Amazon deleted reviews warning about the risks of ingesting sodium nitrite from its website. Sodium nitrite is lethal in small amounts. Death is immediate and painful. Amazon did not include warnings about the extremely painful and irreversible consequences of ingesting sodium nitrite.

Amazon had a duty to exercise reasonable care to prevent people contemplating dying by suicide from foreseeably misusing sodium nitrite to end their lives. Amazon

also had a duty to warn people that it had reason to know were not likely to understand the full consequences of ingesting sodium nitrite and who were using it for that dangerous purpose.

Amazon's duty is not excused because the product it sold, and that it knew was being used by people to end their lives, actually was a cause of those deaths.

Under our case law, a tortfeasor is not liable for the voluntary acts of a victim that results in the victim's harm. I would hold that suicide does not meet the legal definition of voluntary because it is an act performed under duress. As such, it is not a superseding cause that insulates a tortfeasor from liability. Instead, whether a decedent's decision to end their life was also a cause of the death is an issue for the jury to decide under a comparative fault analysis.

I concur with the majority's result and agree that this matter should be remanded to the trial court.

Mungia, J.

Montoya-Lewis, J.

26

No. 103730-9

GORDON McCLOUD, J. (concurring in concurrence)—I agree with the bulk of Justice Mungia's concurring opinion. I agree that the plaintiffs have stated a viable claim that Amazon.com Inc. was negligent under all three theories that they have alleged. I agree that plaintiffs have alleged facts sufficient to support each of those claims. And I agree that science, logic, and our legislature's decision to replace contributory negligence with comparative negligence all compel us to abandon the rule that suicide is always a superseding cause that bars recovery as a matter of law.

But I would not replace one legal rule applicable to all suicides with a different rule applicable to all suicides, as the Mungia concurrence does.

As that concurrence accurately summarizes, "*Arsnow*[1] and *Orcutt*[2] portray suicide as a fully deliberate, voluntary choice, with a limited exception for people who end their life in a 'delusion' or 'frenzy.' This binary is far from reality. Mental health is much more nuanced." Concurrence (Mungia, J.) at 23.

---

[1] *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 156, 161-62, 292 P. 436 (1930).

[2] *Orcutt v. Spokane County*, 58 Wn.2d 846, 850-51, 364 P.2d 1102 (1961).

We should fully reject that inaccurate "binary" and fully appreciate "reality." That means we should not replace the (nearly) blanket rule that suicide is always a superseding cause with a blanket rule that suicide is never a superseding cause. Instead, whether a suicide in a particular case constitutes a superseding cause that bars recovery must be a question of fact for the jury. That is the only rule that rejects the problematic "binary."

For that reason, I would not adopt the rule that "Death by suicide is not a voluntary, willful choice under a proximate cause analysis and, accordingly, is not a superseding cause." *Id.* at 17. Instead, I would adopt the following rule: Death by suicide is not *necessarily* a voluntary, willful choice under a proximate cause analysis and, accordingly, *it is not necessarily* a superseding cause.

With these reservations, I join Justice Mungia's concurrence.

_____
Gordon McCloud, J.